John J. TURCHI, Jr. and Mary
E. Turchi, Appellants

v.

PHILADELPHIA BOARD OF LI-
CENSE AND INSPECTION REVIEW
and Concerned Citizens in Opposition
to the Dilworth Development.

Commonwealth Court of Pennsylvania.

Argued Feb. 8, 2011.

Decided April 18, 2011.

Neil Sklaroff and Matthew N. McClure, Philadelphia, for appellants.

Richard C. DeMarco, Philadelphia, for appellee Concerned Citizens in Opposition to the Dilworth Development.

Jane L. Istvan, Philadelphia, for amicus curiae Philadelphia Historical Commission.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge COHN JUBELIRER.

John J. Turchi, Jr. and Mary E. Turchi (Landowners) appeal from the May 19, 2010, Order of the Court of Common Pleas of Philadelphia County (trial court) affirming the November 9, 2008, decision of the Philadelphia Board of License and Inspection Review (Board) that reversed the November 19, 2007, decision of the Philadelphia Historical Commission (Historical Commission) approving a permit for the renovation and development of a historical-

ly designated building, the Dilworth House, located at 223–25 South Sixth Street within the City of Philadelphia's (City) Society Hill Historic District (the Project). Based on its interpretation of the Historic Preservation Ordinance, Philadelphia Code (Code) §§ 14–2007(1)–(10), the Historical Commission approved the Project and concluded that: (1) the renovations proposed in the Project were not a "demolition in significant part" and, therefore, the Project was an "alteration"[1] and not a "demolition"[2] under Section 2(f) (Minutes of Meeting of the Historical Commission, September 8, 2006, at 32, R.R. at 341a; Minutes of Meeting of the Historical Commission, November 9, 2007, at 14, R.R. 366a); and (2) the Project's renovations were "appropriate" under Section 7(k) of the Historic Preservation Ordinance. (Minutes of Meeting of the Historical Commission, September 8, 2006, at 35, R.R. at 344a; Minutes of Meeting of the Historical Commission, November 9, 2007, at 14, R.R. at 366a; Code §§ 14–2007(2)(f), (7)(k).) Concerned Citizens in Opposition to the Dilworth Development (Concerned Citizens) and the Society Hill Civic Association appealed to the Board. The Board disagreed with the Historical Commission's interpretations of "demolition in significant part" and "appropriateness" of the Project under the Historic Preservation Ordinance and disapproved the permit. (Board Op. at 1–9.) Landowners appealed to the trial court, which affirmed the Board on the basis that neither the Phila-

---

1. An "alteration" is defined as "[a] change in the appearance of a building, structure, site or object which is not otherwise covered by the definition of demolition, or any other change for which a permit is required under The Philadelphia Code of General Ordinances." (Section 2(a) of the Historic Preservation Ordinance, Code § 14–2007(2)(a), R.R. at 316a.)

2. A "demolition" is defined as "[t]he razing or destruction, whether entirely or *in significant part,* of a building, structure.... Demolition includes the removal of a building, structure ... from its site or the removal or destruction of the façade or surface." (Section 2(f) of the Historic Preservation Ordinance, Code § 14–2007(2)(f), R.R. at 316a (emphasis added).)

delphia Home Rule Charter (Home Rule Charter), nor the Code, contains any language requiring that the Board grant deference to the Historical Commission. Landowners now appeal to this Court.[3]

This appeal arises from Landowners' application to the Historical Commission for a permit to develop the Project pursuant to Section 7 of the Historic Preservation Ordinance, Code § 14–2007(7) (establishing the procedures for obtaining a permit to alter or demolish an historically-designated building).[4] The Project consists of the renovation and preservation of the brick-clad main portion of the Dilworth House and the removal of the side and rear wings, which would be replaced with a sixteen-story condominium structure that would connect to the Dilworth House. Because the Project requires the removal of the side and rear wings, along with integration of the condominiums into this historically-designated property, Landowners must comply with the permitting procedures of the Historic Preservation Ordinance. Additionally, because the Project requires the removal of a portion of an historically-designated property, the Historical Commission must first determine, pursuant to Section 2(f), whether this re-

moval constitutes a "significant part" of the building because, and if it does, Section 7(j) prohibits the issuance of a permit unless the Historical Commission finds that the removal is in the public interest or that the building, structure, site, or object cannot be used for any purpose for which it may reasonably be adapted. (Code §§ 14–2007(2)(f), (7)(j), R.R. at 316a, 323a.) If the Project constitutes a removal *not* "in significant part," the removal is considered an "alteration," not a "demolition." (Code §§ 14–2007(2)(a), (f), R.R. at 316a.) The characterization of the Project as either an "alteration" or a "demolition" determines the factors that a permit applicant must satisfy to obtain a permit. Where the Historical Commission has no objection, the Board shall grant the permit subject to other applicable requirements, including, *inter alia*, those found in Section 7(k) regarding "appropriateness." (Code §§ 14–2007(7)(g), (k), R.R. at 322a–324a.)

In this case, upon Landowners' application for a permit to renovate the Dilworth House,[5] the Historical Commission initially referred the application to its Architectural Committee.[6] After hearing testimony that the wings, which Landowners sought to remove, were not a defining feature of

3. We note that the Society Hill Civic Association was an original appellant to the Board, and in this appeal is an Amicus Curiae and did not file a brief. The Preservation Alliance for Greater Philadelphia has filed a brief as Amicus Curiae herein.

4. Section 7(g) of the Historic Preservation Ordinance provides that the Historical Commission can approve or deny a permit application for alterations to, or demolition of, a historic building. (Code § 14–2007(7)(g), R.R. at 321a.)

5. This was the fourth proposal submitted for the Project. The first application proposed a total demolition with construction of a 15–story residential building in its place, which was denied. Landowners withdrew the pro-

posal. The second application proposed a total demolition with construction of a 15–story residential building with a portion of the front façade of the historic building to be rebuilt at the ground level of the new building, which was denied, followed by its withdrawal by Landowners. The third proposal, never officially submitted but distributed to the Historical Commission, proposed retaining most of the Dilworth House and constructing a residential building at the rear of the lot. No action was taken on this unofficial proposal. (Minutes of Meeting of the Architectural Committee, July 25, 2006, at 9, R.R. at 327a.)

6. The Architectural Committee included noted preservation architects Robert Thomas and Daniela Holt Voith.

the Dilworth House because they were service areas, were not architecturally significant portions of the Dilworth House, and were not visible parts of the Dilworth House, the Architectural Committee determined that the Project: (1) was not a "demolition in significant part" pursuant to Section 2(f) of the Historic Preservation Ordinance and, therefore, was an "alteration" pursuant to Section 2(a); and (2) was "appropriate" pursuant to Section 7(k) of the Historic Preservation Ordinance.

Next, the full Historical Commission bifurcated its consideration of the Project. The Historical Commission first voted unanimously to approve the Project in concept, with one abstention. (Minutes of Meeting of the Historical Commission at 35, September 8, 2006, at 35, R.R. at 344a.) The Historical Commission granted final approval on November 9, 2007, after the Project was again discussed in an open public meeting, unanimously approving it as "*not* a 'demolition in significant part'" and, therefore, an alteration. (Minutes of Meeting of the Historical Commission, November 9, 2007, at 14, R.R. at 366a (emphasis added).)

Concerned Citizens appealed the Historical Commission's decision to the Board claiming, *inter alia*, that it committed errors of law: (1) in finding that the Project was not a "demolition" pursuant to the Historic Preservation Ordinance; (2) by not applying the proper Secretary of the Interior's "Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings" (the Secretary's Standards), specifically Standards 1, 2, 9, and 10 of 36 C.F.R. § 67.7(b); and (3) by not applying the Historic Preservation Ordinance to the Project. Additionally, the Society Hill Civic Association, Matthew DiJulio, and Benita Fair Langsdorf appealed the Historical Commission's decision on similar grounds and also claimed,

*inter alia,* that the decision should be reversed because it was arbitrary and capricious. The Board held six full record hearings, issued findings of fact and conclusions of law, and reversed the Historical Commission. In doing so, the Board disagreed with the Historical Commission's interpretations of the terms "alteration" and "appropriateness" in the Historic Preservation Ordinance and determined that: (1) "the November [ ]9, 2007 approval by the Historical Commission that ... [the] application 'is not a demolition in significant part' was in error," (Board Op., Conclusion of Law (COL) ¶ 5); and (2) "the ... approval [of] ... [the] application to construct the [Project] was in error," (COL ¶ 6), because the Historical Commission did not define the Project as "appropriate" as the Board would have defined it. (*See* Board Op., Findings of Fact (FOF) ¶ ¶ 35–44.)

Landowners appealed to the trial court, which affirmed the Board's determination, concluding that the Board "plays a supervising role over the [Historical] Commission subject to [the trial court's] review," and that the Board "has the authority to hear appeals directly from the [Historical] Commission and render a binding decision that affirms, modifies or reverses the [Historical] Commission." (Trial Ct. Op. at 6.) The trial court also concluded that "substantial evidence and testimony" taken by the Board "proved that the [Historical] Commission's decision conflicted with several factors under" the Historic Preservation Ordinance. (Trial Ct. Op. at 6.) The trial court reasoned that the Board has broad powers of review under Section 5–1005 of the Home Rule Charter. Concluding that the Home Rule Charter is clear and unambiguous, the trial court further explained that the Board's standard of review of the Historical Commission's decisions is *de novo*. The trial court rejected the argument that the Board must grant

deference to the decisions of the Historical Commission because "[n]either the Code nor the [Home Rule] Charter has any language that the Board is required to give deference to the [Historical] Commission [ ]or any similar agency." (Trial Ct. Op. at 5.)

■ Landowners now appeal to this Court. A principal issue on appeal is whether the Board must give deference to the Historical Commission's determinations made pursuant to the Historic Preservation Ordinance, which the Historical Commission is charged with administering, and, if so, how the Board should apply this deference within its own proper scope and standard of review.[7]

## I. The Historical Commission

Under the Historic Preservation Ordinance, the Historical Commission is the City agency empowered to designate buildings as historic and to approve or deny permit applications for alterations to and/or demolitions of historically-designated buildings. (Sections 4(a), (b), and (d) of the Historic Preservation Ordinance, Code §§ 14–2007(4)(a)–(b), (d), R.R. at 317a–18a). The composition of the Historical Commission is mandated by the Historic Preservation Ordinance and is very specific; it consists of various City government representatives and eight members appointed by the Mayor, including "an architect experienced in the field of historic preservation," a historian, an architectural historian, a real estate developer, "a representative of a Community Development Corporation," and "a representative of a community organization." (Section 3 of the Historic Preservation Ordinance, Code § 14–2007(3), R.R. at 317a.) The Historic Preservation Ordinance empowers the Historical Commission to exercise quasi-legislative discretion in designating buildings historic and administrative discretion in reviewing applications for alterations or demolitions of historically-designated properties. (Code § 14–2007(4), R.R. at 317a–18a.) The administration of the Historic Preservation Ordinance requires reasoned applications of specialized knowledge and experience in the areas particularly affecting historic preservation in order to interpret the operative terms of the Historic Preservation Ordinance, such as those at issue in this case: "alteration," "demolition," "significant," and "appropriateness." (*See generally* Code §§ 14–2007(1)–(10), R.R. at 315a–26a.) Thus, there are no bright-line standards or mechanical applications similar to those found in ordinary zoning or land use regulations, such as height restrictions or parking ratios; rather, the standards involved here, such as the "appropriateness" of a particular project, must take into consideration the historical importance of a particular property or structure and the design of a project. (Code § 14–2007(7)(k), R.R. at 323a–24a.) To meet the specialized needs and requirements of administering a specialized ordinance, the Historic Preservation Ordinance empowers the Historical Commission to promulgate regulations and establish committees to assist in its administration of the Historic Preservation Ordinance and in setting the City's historic preservation policy. (*See, e.g.,* Code § 14–2007(4)(e)–(h), R.R. at 318a.)

## II. The Board of License and Inspection Review

Like the Historical Commission, the Board is a City agency. The Board was

---

7. Because the issue in this case is a question of law, this Court's scope of review is plenary.

*Great Lakes Energy Partners v. Salem Township,* 931 A.2d 101, 103 (Pa.Cmwlth.2007).

created by Chapter 10 of Article V of the Home Rule Charter. Phila. Charter § 5–1005. The Home Rule Charter provides:

> The Board of License and Inspection Review shall provide an appeal procedure whereby any person aggrieved by the issuance, transfer, renewal refusal, suspension, revocation or cancellation of any City license [8] or by any notice, order or other action as a result of any City inspection, affecting him directly, shall upon request be furnished with a written statement of the reasons for the action taken and afforded a hearing thereon by the Board of License and Inspection Review. Upon such hearing the Board shall hear any evidence which the aggrieved party or the City may desire to offer, shall make findings and render a decision in writing. The Board may affirm, modify, reverse, vacate or revoke the action from which the appeal was taken to it.

Phila. Charter § 5–1005. In the official annotation to this section, the Board is referred to as an "agency created for the purpose of affording citizens, adversely affected by the exercise of licensing and inspection powers vested in City agencies, an orderly procedure, in conformity with due process, for the review of action taken against them." *Id.*, annotation. In sum, the Board hears appeals involving all City permits and licenses, including those relating to building safety and sanitation, signs, zoning, plumbing and drainage facilities, sanitary facilities, sewage disposal systems, dumpsters, and handguns. Section 5–1002 of the Home Rule Charter, Phila. Charter § 5–1002.

Unlike the Historical Commission, the Board is empowered to hear appeals on many subject areas involving the issuance or denial of all permits and licenses in the City. The Board's members are not required to have specialized expertise in the area of historic preservation. Although Section 5–1005 of the Home Rule Charter gives the Board jurisdiction over City permit and license appeals generally, Section 10 of the Historic Preservation Ordinance specifically provides the right of appeal to the Board for "[a]ny person aggrieved by the issuance or denial of any permit reviewed by the [Historical] Commission." (Code § 14–2007(10), R.R. at 326a.)

## III. The Principle of Administrative Agency Deference

■■■ It is a fundamental principle of administrative law that an administrative agency's interpretation of the statute it is charged to administer is entitled to deference on appellate review absent "fraud, bad faith, abuse of discretion, or clearly arbitrary action." *Winslow–Quattlebaum v. Maryland Insurance Group*, 561 Pa. 629, 635–36, 752 A.2d 878, 881 (2000). Our Supreme Court has stated:

> It is well settled that when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation.

*Id.* at 635, 752 A.2d at 881. In another case in which our Supreme Court was confronted with an agency's interpretation of its own regulations, the Supreme Court cited the United States Supreme Court for the principle that:

> In reviewing an administrative agency's interpretation of its own regulations, courts are governed by a two step

---

**8.** Pursuant to Section 5–1001(a), the term "license" also includes a "permit." Phila. Charter § 5–1001(a).

analysis. First, "[i]n construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"

*Department of Public Welfare v. Forbes Health System,* 492 Pa. 77, 81, 422 A.2d 480, 482 (1980) (quoting *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945))) (alteration in original). In the instant case, the reviewing body is not a court, but a reviewing board found within the City's executive department that was created by the Home Rule Charter and granted adjudicatory authority to hear appeals on permit decisions from within its own Department of Licenses and Inspections. In addition, Section 10 of the Historic Preservation Ordinance specifically authorizes the Board to hear appeals by parties "aggrieved by the issuance or denial of any permit reviewed by the [Historical] Commission." (Code § 14–2007(10), R.R. at 326a.)

In examining the issue of competing interpretations of regulations by the quasi-judicial Environmental Hearing Board (EHB) and the Department of Environmental Protection (DEP), the agency charged with administering the Commonwealth of Pennsylvania's various environmental laws and regulations, this Court, in *Department of Environmental Protection v. North American Refractories Co.,* 791 A.2d 461, 465–66 (Pa.Cmwlth.2002), looked to the United States Supreme Court's analysis in *Martin v. Occupational Safety and Health Review Commission,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), for guidance. "It is well established 'that an agency's construction of its own regulations is entitled to substantial deference.'" *Id.* at 150, 111 S.Ct. 1171

(quoting *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986)).

In *Martin,* the Supreme Court expressed the principle that, "[i]n situations in which 'the meaning of [regulatory] language is not free from doubt,' the reviewing court should give effect to the agency's interpretation so long as it is 'reasonable.'" *Id.* (quoting *Ehlert v. United States,* 402 U.S. 99, 105, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971)) (alteration in original). In *North American Refractories,* this Court noted that, "the Supreme Court had to decide to whom a reviewing court ought to defer when two actors, assigned different roles by statute, furnish reasonable but conflicting interpretations of an ambiguous regulation." *North American Refractories,* 791 A.2d at 465. In *North American Refractories,* one actor was an administrative agency having a role similar to the Historical Commission, and the other was assigned an adjudicatory responsibility, similar to that assigned to the Board. Thus, when we were confronted with competing, but reasonable, interpretations by two dueling agencies, the DEP and the EHB, we were guided by *Martin* in three ways; we: (1) "applied a presumption against the adjudicative actor;" (2) "concluded that [the Legislature] did not intend the adjudicative actor to play a policy-making role;" and (3) concluded that the legislative body "intended to invest" the administrative actor with "authoritative interpretive powers." *North American Refractories,* 791 A.2d at 465.

In *North American Refractories,* we explained, pursuant to *Martin,* why the administrative actor should "possess authoritative interpretive powers." *North American Refractories,* 791 A.2d at 465. The administrative actor has the greater number of encounters with the issues and is, therefore, "more likely to develop the

expertise relevant to assessing the effect of a particular regulatory interpretation." *Id.* (quoting *Martin,* 499 U.S. at 152–53, 111 S.Ct. 1171). This expertise, along with the administrative actor's authority over the legislation or regulations it is charged to administer, were the factors that influenced the Supreme Court "to presume that Congress intended to invest the administrative actor with authoritative interpretive powers." *Id.* We, in turn, applied this reasoning in *North American Refractories* and determined "that the General Assembly intended to invest the [administrative actor] with authoritative interpretive powers." *Id.* We found it persuasive that the Supreme Court concluded in *Martin* that "Congress did not intend the adjudicative actor to play a policy-making role" but, rather, intended to delegate the "nonpolicy-making adjudicatory powers typically exercised by a *court* in the agency-review context." *North American Refractories,* 791 A.2d at 465–66 (quoting *Martin,* 499 U.S. at 154, 111 S.Ct. 1171 (emphasis in original)). We believe that this reasoning is equally valid in the instant case where the Historical Commission has the policy-making role and is charged with administering the Historic Preservation Ordinance and the Board has nonpolicy-making, but quasi-judicial or adjudicatory review authority.

This principle of granting deference to administrative agency interpretations of the statutes or regulations they are charged with administering has been reaffirmed repeatedly by this and our Supreme Court. In *Rendell v. State Ethics Commission,* 603 Pa. 292, 983 A.2d 708 (2009), the Pennsylvania Supreme Court once again relied upon *Winslow–Quattlebaum* when it noted that the Ethics Commission's interpretation of what constitutes "business" under the conflict of interest provisions of the Public Official and Em-

ployee Ethics Act, 65 Pa.C.S. §§ 1101–1113, was entitled to deference and that "courts are to afford substantial deference to the interpretation rendered by the agency charged with [a law's] administration." *Rendell,* 603 Pa. at 306, 983 A.2d at 716. In *Dechert LLP v. Commonwealth,* 606 Pa. 334, 998 A.2d 575 (2010), in examining the question of what constituted "tangible personal property" subject to sales tax, the Supreme Court stated that

> [i]t is this Court's practice to afford substantial deference to the interpretation rendered by the agency charged with its administration.

*Id.* at 586.

The Pennsylvania Supreme Court also has applied this principle to local administrative agencies as well. In *Colville v. Allegheny County Retirement Board,* 592 Pa. 433, 926 A.2d 424 (2007), the administrative agency's interpretation of a section of the county's retirement legislation it administered was in dispute based on the agency's interpretation of the word "within" to mean "before the end of." *Id.* at 442–43, 926 A.2d at 430. Our Supreme Court, citing *Winslow–Quattlebaum,* stated that we "afford great deference to the interpretation" of an administrative agency "overseeing the implementation of such legislation." *Colville,* 592 Pa. at 443, 926 A.2d at 430 (quoting *Winslow–Quattlebaum,* 561 Pa. at 635, 752 A.2d at 881).

It is undisputed that the Historical Commission is the local administrative agency charged by City Council with administering the Historic Preservation Ordinance. It is also undisputed that City Council required that the Historical Commission be composed of members with specialized knowledge, background, and expertise in the area of historic preservation. Applying these facts to the principles of administrative law in this case where there are

competing actors on the local level, i.e., the Historical Commission and the Board, we rely upon the analysis in *Martin*, as we did in *North American Refractories*, and apply that analysis to the case at bar.

We begin by applying *Martin's* presumption against the adjudicative actor, i.e., the Board, because it is the administrative actor, i.e., the Historical Commission, that has numerous encounters with matters of historic preservation and those areas where the concern for historic preservation may conflict with the growth and development necessary to a large city. We also consider it important that the Historical Commission has greater expertise in this area and has been authorized to promulgate regulations and administer the Historic Preservation Ordinance. City Council invested the Historical Commission with the necessary authoritative interpretive powers to execute and interpret the Historic Preservation Ordinance. From this, we conclude that City Council did not intend the Board to have the same authoritative interpretative powers. To permit the Board to reinterpret and reconsider the deliberative, purposeful, and carefully examined interpretations and policies of the Historical Commission would be beyond the Board's limited role as an appellate adjudicative entity, which must give deference to the Historical Commission's reasonable interpretations pursuant to *Martin* and *North American Refractories*. Therefore, we conclude that the Historical Commission's reasonable interpretations of the Historic Preservation Ordinance are entitled to deference and that these interpretations "become[ ] of controlling weight unless [they are] plainly erroneous or inconsistent" with the Historic Preservation Ordinance. *Forbes Health System*, 492 Pa. at 81, 422 A.2d at 482. Therefore, the Board must not substitute its own interpretation of a definition or term of the Historic Preservation Ordinance where the Historical Commission has already provided a reasonable interpretation of that definition or term.

## IV. The Board's Decision

■ After holding public hearings and creating its own record in this case, the Board issued Findings of Fact and Conclusions of Law. (Board Op. at 2–9.) The Board received evidence, as authorized by Section 5–1005 of the Home Rule Charter, and determined, *inter alia*, that the Historical Commission erroneously: (1) interpreted the Historic Preservation Ordinance's definition of a demolition; and (2) applied the Historic Preservation Ordinance's list of factors for assessing the "appropriateness" of an alteration in a historic district. In making these determinations and reversing those made by the Historical Commission, the Board gave no deference to the Historical Commission's interpretations of the relevant terms of the Historic Preservation Ordinance by limiting its review to determining whether the Historical Commission's interpretations were clearly erroneous or an abuse of discretion.

The Board stated that "[t]he term 'significant part' is not defined in Philadelphia Code § 14–2007." (Board Op., FOF ¶ 23.) On this point, the Board noted that "[t]here was conflicting testimony on the precise amount of space either measured by square feet or as a percentage of the building's footprint that would be removed." (FOF ¶ 25.) The Board then found there was "sufficient and substantial evidence in the Record to support a finding that just over half of the building's footprint would be removed by the proposed project" in contrast to the Historical Commission's statement "that 48% of the footprint would be removed." (FOF ¶ 26.) However, the Board also noted that:

Mr. Schelter encouraged a more global view on the issue of whether removal of portions of Dilworth House would be "significant." That is, rather than looking at the numerical value of square footage or footprint area that would be removed, Mr. S[c]helter pointed to the "public experience" when viewing Dilworth House after completion of the proposed project. Both Messrs. Schelter and Thomas testified that the "box" of the Colonial Revival structure of Dilworth House is the 'significant' part of the structure and that most of that box would be retained and remain visible to the public. (FOF ¶ 30.) Next, the Board found "the position advanced by Mr. Gallery to be credible and persuasive" and stated that "[a]ny evidence that is inconsistent with Mr. Gallery's testimony and with the Conclusions of Law of this Board, this Board finds to be not credible." (FOF ¶ 34.) In this finding of fact, the Board rejected as not credible the testimony of Mr. Schelter and Mr. Thomas regarding the percentage of the footprint of the Dilworth House to be razed, as well as their position that the percentage of the footprint to be razed is not the sole criterion to be used to determine whether the Project involved a "significant" part of the Dilworth House. Unlike Mr. Gallery, Mr. Schelter and Mr. Thomas advocated a more global view in interpreting what was "significant" from the perspective of the historical importance.

We agree with the Historical Commission that the administrative interpretation and "[c]onstruction of the phrase 'in significant part' and the meaning of the statutory term 'demolition' are not matters of 'credibility,' " (Historical Comm'n Br. at 27), but are matters within the province of the administrative expertise of the Historical Commission. As such, the Historical Commission's interpretation of those phrases, as well as the Historic Preservation Ordinance in general, must be accorded deference under *Martin, Colville,* and *North American Refractories.* Where there are competing interpretations of the definitions of the operational terms in the Historic Preservation Ordinance, it is "within the province of the [Historical] Commission, not the Board," to interpret the Historic Preservation Ordinance and adopt a definition. (Historical Comm'n Br. at 29.) When the Board replaced the Historical Commission's definitions with its own, transforming the interpretation of phrases into credibility determinations, the Board exceeded its appellate scope of review. When reviewing a decision of the Historical Commission, the Board's duty was to "determine if [the Historical Commission's] actions can be sustained or supported by evidence taken by [the Board]." *North American Refractories,* 791 A.2d at 466. In reversing the Historical Commission's determinations, the Board erred in not giving the Historical Commission's interpretation of the definitions and phrases contained within the Historic Preservation Ordinance deference as required by, *inter alia, Martin* and *North American Refractories.*

The Board further exceeded its scope of review when it did not grant deference to the Historical Commission's interpretation of the meaning of "appropriateness" under the Historic Preservation Ordinance. The Board's findings of facts about structure height, neighboring properties, and the neighborhood's environment were within its province. However, the Historic Preservation Ordinance states in Section 7(k) that "[i]n making its determination as to the appropriateness of proposed alterations, demolition or construction, the [Historical] Commission *shall* consider the following:" and then continues by listing seven items. (Code, §§ 14–2007(7)(k),

R.R. at 323a–24a (emphasis added).) The Board seemingly confined its examination of "appropriateness" to only some of the factors in the Historic Preservation Ordinance and did not review each of the factors set forth in the Historic Preservation Ordinance, and considered by the Historical Commission, in examining whether there was evidence in the record to support the Historical Commission's determination that the Project was appropriate for the neighborhood rather than explaining why the Historical Commission's interpretation of appropriateness was clearly erroneous under Section 7.

In sum, this Court concludes that the Board erred when it did not give deference to the Historical Commission's interpretations of the Historic Preservation Ordinance, specifically its interpretation of the terms "alteration" under Section 2(a), "in significant part," and "demolition," under Section 2(f), and "appropriateness" under Section 7(k) of the Historic Preservation Ordinance. (Code §§ 14–2007(2)(a), 2(f), (7)(k), R.R. at 316a, 323a–24a.) Accordingly, we must remand this matter to the Board for further review and for the Board to issue a new determination based on the evidence presently before it, with deference being given to the Historical Commission's interpretation of the Historic Preservation Ordinance and the application of the principle that the Historical Commission's interpretations "become[ ] of controlling weight unless [they are] plainly erroneous or inconsistent with" the Historic Preservation Ordinance. *Forbes Health System*, 492 Pa. at 81, 422 A.2d at 482.

For these reasons, the trial court's Order is vacated and this matter is remanded to the Board to issue a new determination in accordance with the foregoing opinion.

### ORDER

**NOW**, April 18, 2011, the Order of the Court of Common Pleas of Philadelphia County in the above-captioned matter is hereby **VACATED** and this matter is **REMANDED** to the Philadelphia Board of License and Inspection Review for it to issue a new determination in accordance with the foregoing opinion.

Jurisdiction relinquished.