In Re:  Appeal of Amit Azoulay,       :
Idit Azoulay and Assaf Lavon,         :
                   Appellants         :
                                      :
            v.                        :
                                      :
Philadelphia Zoning Board of          :
Adjustment and City of Philadelphia   :
and Hillcrest Preservation Alliance,  :      No.  1085 C.D. 2017
LLC, and Friends of The Wissahickon   :      Argued:  June 4, 2018
                                      :
                                      :
                                      :
In Re:  Appeal of Amit Azoulay,       :
Idit Azoulay and Assaf Lavon          :
                                      :
            v.                        :
                                      :
Zoning Board of Adjustment            :
                                      :
In Re:  Appeal of Hillcrest           :
Preservation Alliance, LLC            :
                                      :
            v.                        :
                                      :
Zoning Board of Adjustment            :
                                      :
Appeal of:  Hillcrest Preservation    :      No.  1177 C.D. 2017
Alliance, LLC                         :      Argued:  June 4, 2018


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION
BY JUDGE FIZZANO CANNON            FILED:  September 7, 2018

This matter involves consolidated appeals from the July 7, 2017 order of the Court of Common Pleas of Philadelphia County (trial court) affirming the decision of the City of Philadelphia's (City) Zoning Board of Adjustment (ZBA) which: (i) upheld the issuance of a subdivision permit which approved a lot line adjustment resulting in the division of one lot into two lots; (ii) denied an objector's request to amend its appeal to include a challenge to the zoning permit issued for the second lot resulting from the subdivision; and (iii) sustained an objector's appeal to the zoning permit issued for the other lot.

Amit Azoulay, Idit Azoulay and Assaf Lavon (collectively, Owners) own property located in the City's Chestnut Hill neighborhood. ZBA's Findings of Fact (F.F.) No. 7. The property is zoned RSD-1 (Residential Single-Family Detached-1) and is located entirely within the Wissahickon Watershed Overlay District (WWOD). F.F. No. 8. The property has never been developed. *See* F.F. No. 9.

Owners sought to subdivide the property, originally known as 114 Hillcrest Avenue, into two lots. On May 31, 2013, the City's Department of Licenses & Inspections (L&I) issued Zoning Permit No. 473255 approving "the relocation of lot lines to create (2) lots from (1) lot (114 Hillcrest Ave.)" (Subdivision Permit). F.F. No. 1. The newly created lots are known as 114 Hillcrest Avenue and 116 Hillcrest Avenue. *See* F.F. No. 2.

Owners then also applied to L&I for permits for "zoning approval for the erection of detached structure with cellar" and creation of interior off-street parking spaces and "use registration for single family dwelling" on each of the newly created lots. Reproduced Record (R.R.) at 65a-66a; *see* F.F. No. 2. Because the lots are located within the WWOD near a "surface water body," the WWOD's

2

impervious coverage rule was relevant to the permit applications. At the time relevant here, the impervious coverage rule provided, "[t]here shall be no new impervious ground cover constructed or erected within 200 ft. of the bank of a surface water body or within 50 ft. of the center line of a swale within the [WWOD]." Phila., Pa., Zoning Code § 14-510(5) (2016) (Zoning Code).[1] (Section 510 of the Zoning Code, § 14-510, concerns the Wissahickon Watershed Overlay District and sometimes may be referred to herein as the WWOD Ordinance.)

The City's Zoning Code provides that before L&I can issue any zoning or building permits for development in the WWOD, the City's Planning Commission must certify that the proposed development conforms to the requirements of the WWOD Ordinance. Zoning Code § 14-510(8). The Planning Commission approved Owners' plans, and subsequently, on June 17, 2013, L&I issued Owners two "zoning/use permit[s]" for the property, one for each of the newly created lots, pursuant to Owners' application.[2] R.R. at 65a-66a; *see* F.F. No. 2. The zoning/use

---

[1] We note this definition in the Zoning Code was amended after the parties appealed to this Court. *See* Phila., Pa., City Council Bill No. 180346-A § 14-510(5) (July 18, 2018). The Zoning Code now provides,

> There shall be no new impervious ground cover constructed or erected within 200 ft. of the bank of a *stream* or within 50 ft. of the center line of a swale within the [WWOD]. *Streams and [s]wales that have been buried in sewer pipe, or in an artificial, concrete and stone channel, shall be excluded.*

Zoning Code § 14-510(5) (amendments in italics). This amendment was not made retroactive. *See* City Council Bill No. 180346-A § 2 (stating "[t]his [o]rdinance shall take effect immediately"); *cf.* Section 1926 of the Statutory Construction Act of 1972 (stating no statute shall be construed to be retroactive unless clearly and manifestly intended by the General Assembly). Therefore, we must apply the Zoning Code as written at the time of Owners' permit applications.

[2] The permits stated that they do not authorize any construction until related construction permits are issued. R.R. at 65a-66a.

permits were Permit No. 476557 (114 Permit) and Permit No. 476558 (116 Permit). F.F. No. 2.

On June 27, 2013, the Hillcrest Preservation Alliance, LLC (Objector) filed a timely appeal challenging L&I's issuance of the Subdivision Permit and the 114 Permit.[3] F.F. No. 3. The ZBA held four public hearings on the appeal. *See* F.F. No. 4. At the first hearing, which was held on February 5, 2014, the issue arose as to whether Objector appealed the 116 Permit. *See* F.F. Nos. 15-17. On February 26, 2014, Objector's counsel submitted an amended appeal that included the 116 Permit. The ZBA reserved decision on the amended appeal. The ZBA held additional public hearings on the appeal on March 25, 2015, April 29, 2015, and July 8, 2015. F.F. No. 4. Subsequently, the ZBA issued a decision in which it: (i) denied Objector's appeal of the Subdivision Permit; (ii) denied Objector's request to amend its appeal to include the 116 Permit; and (iii) sustained Objector's appeal of the 114 Permit, concluding that the Planning Commission erred in treating the proposed development as permitted due to the inclusion of green elements and that such interpretation disregards the plain language of the WWOD Ordinance and allows for the introduction of new impervious elements within the 200-foot setback. F.F. No. 6, *see* Conclusions of Law (C.L.) No. 23.

Owners and Objector filed cross-appeals from the ZBA's decision with the trial court, which consolidated the appeals. Owners, Objector and the City filed briefs, and the trial court heard oral arguments. Objector challenged the ZBA's denial of Objector's appeal of the Subdivision Permit and the ZBA's denial of Objector's request to amend its appeal to include the 116 Permit. Owners and the

---

[3] Objector consists of "a group of concerned neighbors" and was formed a few days before the appeal was filed. F.F. No. 13.

City challenged the ZBA's invalidation of the 114 Permit. Subsequently, the trial court issued an order affirming all three determinations of the ZBA.

Both Owners and Objector filed appeals with this Court, which are consolidated for disposition.[4] 9/27/17 Order. On appeal, the parties raise the following issues: (i) whether the ZBA erred when it denied Objector's appeal from the Subdivision Permit and upheld the issuance of the Subdivision Permit; (ii) whether the ZBA erred when it refused to allow Objector to amend its notice of appeal to include the 116 Permit; and (iii) whether the ZBA erred in sustaining Objector's appeal and concluding that the 114 Permit was erroneously issued. With respect to the final issue, we are asked to decide whether the ZBA was required to give deference to the Planning Commission's initial determination that there was no new impervious ground cover or, its later claim at the hearing, that the proposed development was not located within the 200-foot setback.[5]

---

[4] Where, as here, the trial court does not take additional evidence, this Court's review is limited to determining whether the zoning board committed an error of law or an abuse of discretion. *See Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 639 (Pa. 1983). A zoning board abuses its discretion "only if its findings are not supported by substantial evidence." *Id.* at 640. Substantial evidence is such evidence a reasonable mind might accept as adequate to support a conclusion. *Id.*

[5] The City, although an appellee here, has filed a brief in support of Owners' (designated appellants) position with respect to the 114 Permit only. *See* Pa.R.A.P. 908 (providing rules for appellees who support the appellants' position). The City does not take a position on the other two issues.

The ZBA and the Friends of the Wissahickon were precluded from filing briefs and participating in oral argument due to their failure to file briefs as ordered by this Court. 3/7/18 Order.

## I. Subdivision Permit

Objector argues that the ZBA erred when it denied Objector's appeal from the issuance of the Subdivision Permit. Objector maintains that the subdivision did not comply with the WWOD Ordinance's requirements concerning the 200-foot setback from watercourses, which Objector contends is a dimensional requirement akin to a front, side or rear yard setback.

On May 31, 2013, L&I issued Zoning Permit No. 473255 approving "the relocation of lot lines to create (2) lots from (1) lot[.]" F.F. No. 1. A lot adjustment is "[a] subdivision[6] that results in the creation of new lots that all have street frontage on an existing legally open street shown on the City Plan; or the relocation of existing lot lines, including the combination of existing lots into fewer or differently configured lots." Zoning Code § 14-203(170). The Planning Commission has the authority to provide prerequisite approvals for zoning permits regarding lot adjustments. Zoning Code § 14-301(3)(c)(.1)(.a). The Planning Commission shall approve the lot adjustment if it complies with the lot dimension and street frontage requirements in the Code. Zoning Code § 14-304(6)(c).

Notably, the WWOD Ordinance provisions only apply "during and after construction and to all construction site clearing and earth moving within the

---

[6] The Zoning Code defines subdivision as:

> A division of any part, lot, or area of land by the owner or his or her agent into two or more lots, or changes in existing lot lines, for the purpose of conveyance, transfer, improvement, or sale with or without appurtenant roads, streets, lanes, driveways, and ways dedicated or intended to be dedicated to public use, or the use of purchasers or owners of lots fronting on them. The term subdivision includes re-subdivision and, as appropriate, shall refer to the process of subdividing land or to the land so subdivided.

Zoning Code § 14-203(328).

6

Wissahickon Watershed." Zoning Code § 14-510(2). The subdivision, or lot adjustment, involves only the adjustment of lot lines and does not involve construction, site clearing or earth moving. The 200-foot setback is not applicable to the Subdivision Permit because no buildings or any other type of "impervious ground cover" was proposed as part of that application. Therefore, the ZBA did not err when it concluded that the WWOD Ordinance provisions were not applicable to Owners' subdivision application. Accordingly, the trial court did not err when it affirmed the ZBA's decision denying Objector's appeal of the issuance of the Subdivision Permit.

## II.    *Application to Amend Appeal*

Objector argues that the ZBA erred by refusing to allow Objector to amend its appeal. Objector acknowledges that it did not initially appeal the 116 Permit at the same time it appealed the Subdivision Permit and the 114 Permit, explaining that the 116 Hillcrest Avenue property was never posted with the permit. Objector's Brief at 54-55. Objector maintains that there is no evidence in the record to establish a conspicuous posting of all three permits, asserting there is not a single picture showing separate postings at the property. Objector further argues that the ZBA erred in construing its request to amend its appeal as the institution of a new appeal. Objector asserts that its Application for Appeal referenced all permits for both lots, and points to its statement in its initial appeal that "[Owners] propose[] to create two lots from one lot, which is identified as 114 Hillcrest Avenue (the "Subject Property"), for the purpose of developing two (2) single-family detached structures" to support its claim that its request was simply a clarification of an existing action, not a new action. Objector's Brief at 58. Objector also asserts that Owners were not prejudiced by Objector's request to amend, pointing out that the

7

ZBA reserved ruling on Objector's application and that Owners presented evidence on both parcels at the hearings.[7]

The Code provides:

> Within five (5) business days of receipt of any permit under this Zoning Code, including any conditional zoning permit, the permit holder shall post a true copy of the permit on the subject property, along each street frontage (unless impractical) in a place and manner conspicuous to the public, for no less than thirty (30) days.

Zoning Code § 14-303(6)(f)(.1). The Zoning Code further provides:

> Any appeal of an L&I decision must be filed with the Zoning Board within 30 days of the date of L&I's decision. Where the applicant fails to post the permit in compliance with § 14-303(6)(f) (Posting of Permits), any person other than the applicant must file any appeal within 30 days of constructive notice of the L&I decision. All appeals must be filed through a written notice of appeal stating specifically how L&I's decision is inconsistent with the requirements of this Zoning Code or the basis for the requested variance or other relief.

Zoning Code § 14-303(15)(a)(.3).

The ZBA received evidence from Owners regarding the posting of the permits. *See* F.F. Nos. 37-38. The evidence included photographs as well as testimony. *Id.* The fact that we may not be able to see the writing on the photographs of the postings in the record does not mean there is not substantial evidence. The

---

[7] In support of its argument, Objector cites provisions of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101 – 11202, and case law interpreting the MPC. The MPC, however, is not applicable to zoning in the City. *Society Created to Reduce Urban Blight v. Zoning Bd. of Adjustment of Phila.*, 729 A.2d 117, 120 (Pa. Cmwlth. 1999).

ZBA credited Owners' evidence, including their testimony regarding posting the permits on the properties, and concluded that Owners established that they fully complied with the posting requirements of the Zoning Code. C.L. No. 3. It is well-settled that the ZBA is the arbiter of credibility. *Manayunk Neighborhood Council v. Zoning Bd. of Adjustment*, 815 A.2d 652, 658 (Pa. Cmwlth. 2002). This Court may not alter those findings.

Because Owners properly posted the permits on the property, Objector was required to file its appeal within 30 days of the issuance of the permits. *See* Zoning Code § 14-303(15)(a)(.3). Objector failed to do so. Whether Owners were prejudiced is irrelevant; the Zoning Code provides no such exception for one's failure to file a timely appeal. Objector admitted that its initial Application for Appeal referenced permit number 473255 (Subdivision Permit) and permit number 476557 (114 Permit) but did not expressly reference permit number 476558 (116 Permit). R.R. at 148a. Objector's reference in the text of the appeal to the development of "two single family homes" at 114 Hillcrest Avenue does not constitute filing an appeal of the 116 Permit. Additionally, we note that at the first hearing, Objector's counsel described the Application for Appeal as being filed within the 30 days "from the issuance of the *two [p]ermits* at issue in the case here today, which were issued on May 31, 2013, and June 17, 2013." R.R. at 276a (emphasis added). Therefore, we conclude that the ZBA did not err or abuse its discretion by determining that Objector's request was a new appeal rather than a simple amendment and denying Objector's request to amend its appeal.

### III. 114 Permit

The arguments with respect to the 114 Permit center around the WWOD Ordinance's impervious coverage rule. Again, at the relevant time, the

impervious coverage rule provided, "[t]here shall be no new impervious ground cover constructed or erected within 200 ft. of the bank of a surface water body or within 50 ft. of the center line of a swale within the [WWOD]." Zoning Code § 14-510(5). The Planning Commission approved the plans for construction of the single family home based on its determination that the proposed development was not impervious because it included green elements, such as a green roof[8] and porous paving. *See* F.F. Nos. 26(iii)-27, 31, 55; C.L. No. 23. L&I subsequently issued the zoning permits, and Objector appealed the 114 Permit.

After the hearings, the ZBA issued its decision sustaining Objector's appeal of the 114 Permit. The ZBA concluded that the proposed development includes impervious ground cover within the 200-foot buffer. C.L. No. 18. The ZBA concluded that the Planning Commission erred in treating the proposed development as permitted due to the inclusion of green elements because such interpretation disregards the plain language of the ordinance and allows for the introduction of new impervious coverage within the 200-foot setback. C.L. No. 23. The trial court affirmed the ZBA on this issue.

---

[8] At the time of Owners' permit application and the hearings in this matter, the Zoning Code did not contain a definition of green roof. A green roof has been commonly defined as follows: (i) "[a] roof covered with vegetation, especially one intended to provide environmental benefits." "*green roof*," English: Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/us/green_roof (last visited Aug. 16, 2018); (ii) "[a] roof of a building that is partially or completely covered with vegetation and a growing medium, planted over a waterproofing membrane. It may also include additional layers such as a root barrier and drainage and irrigation systems." *Green roof*, Wikipedia, https://en.wikipedia.org/wiki/Green_roof (last visited Aug. 16, 2018). The Zoning Code currently defines green roof as "[a] treatment to a rooftop that supports living vegetation and includes a synthetic, high quality waterproof membrane, drainage layer, root barrier, soil layer, and vegetation layer." Zoning Code § 14-203(138.2), *added by* Phila., Pa., City Council Bill No. 150745-A (Dec. 23, 2015).

Before this Court, Owners and the City argue that the trial court erred in affirming the ZBA's decision sustaining Objector's appeal of the issuance of the 114 Permit. They argue that the issuance of the permit was proper on either of two grounds: (i) that there was no new impervious coverage proposed or (ii) if there was impervious coverage, it would not be constructed within 200 feet of a surface water body. They argue that the ZBA erred because it should have given deference to the Planning Commission's determination that the plans complied with the WWOD Ordinance. They maintain that the Planning Commission's interpretation of the WWOD Ordinance is entitled to deference because, according to Owners and the City, the Planning Commission is charged with interpreting and enforcing the WWOD Ordinance and because the Planning Commission's interpretation was reasonable. In support of their position, they rely primarily on this Court's decision in *Turchi v. Philadelphia Board of License and Inspection Review*, 20 A.3d 586 (Pa. Cmwlth. 2011), in which this Court held that, on appeal to the Philadelphia Board of License and Inspection Review (Review Board) from the Philadelphia Historical Commission's (Historical Commission) issuance of a permit, the Review Board had to give deference to the Historical Commission's interpretation of operative terms in the City's Historic Preservation Ordinance.[9] We held that deference was proper, in part, because the Historical Commission had the policy-making role and was charged with administering the ordinance, whereas the Review Board had quasi-judicial review authority, and because the Historical Commission possessed greater expertise in the area of historic preservation. *Id.* at 593-95.

---

[9] In *Turchi*, the Historical Commission determined that the applicants' proposed renovations were not a "demolition in significant part" and, therefore, the project was an "alteration" and was "appropriate" under the Historic Preservation Ordinance. *Turchi*, 20 A.3d at 589. The Review Board disagreed with the Historical Commission's interpretation of those terms contained in the ordinance and reversed the Historical Commission. *Id.* We held that was error. *Id.* at 594.

11

Courts give "substantial deference to an agency's interpretation of a statute the agency is charged with implementing and enforcing." *Schuylkill Twp. v. Pa. Builders Ass'n*, 7 A.3d 249, 253 (Pa. 2010) (internal quotation marks omitted); *see also Turchi* (stating an agency's construction of its own regulations is entitled to deference). "[A]n administrative agency's interpretation of the statute it is charged to administer is entitled to deference on appellate review absent fraud, bad faith, abuse of discretion[] or clearly arbitrary action." *Turchi*, 20 A.3d at 591 (internal quotation marks omitted). Interpretations of an ordinance that are entitled to deference "become of controlling weight unless they are plainly erroneous or inconsistent" with the ordinance. *Id.* at 594 (internal punctuation omitted); *see Lancaster Cty. v. Pa. Labor Relations Bd.*, 94 A.3d 979, 986 (Pa. 2014) (stating that an administrative agency's interpretation is to be given controlling weight unless clearly erroneous). "However, when an administrative agency's interpretation is inconsistent with the statute itself, or when the statute is unambiguous, such administrative interpretation carries little weight." *Id.*

The WWOD is an overlay district in the Zoning Code. Zoning Code § 14-510. L&I is charged with the power and duty to administer and enforce the Zoning Code except where any powers are specifically granted to another commission under the Zoning Code. Zoning Code § 14-103(3)(a). We recognize that under the Zoning Code, the Planning Commission has the authority to provide "prerequisite approval" for zoning permits in the WWOD. *See* Zoning Code § 14-301(3)(c)(.1)(.h). Additionally, L&I may not issue any permits in the WWOD until the Planning Commission has "certified" to L&I that the proposed development conforms to the requirements of the WWOD Ordinance. Zoning Code § 14-510(8). Nonetheless, even if we were to conclude that the Planning Commission is charged

with implementing and enforcing the WWOD Ordinance and possesses a special expertise warranting deference to its interpretations under *Turchi*, the Planning Commission's interpretations here are not entitled to deference because, as will be explained: (i) its decision to allow development within the 200-foot setback due to the incorporation of green elements is plainly erroneous and inconsistent with the plain language of the ordinance which prohibits any new impervious ground cover within the 200-foot setback; and (ii) its review of the plan with respect to the 200-foot setback was inconsistent and arbitrary.

### a. Impervious Ground Cover

Here, the Planning Commission approved the plans for construction of the single-family home based on its conclusion that the proposed development was not new impervious ground cover because it included green elements, such as a green roof and porous paving. Owners and the City argue that the ZBA erred by not giving deference to the Planning Commission's determination that there was no impervious ground cover. Owners and the City contend that the ZBA failed to defer to the Planning Commission's definition of "impervious ground cover," under which green roofs, porous paving and other permeable surfaces are not impervious. City's Brief at 19; *see* Owners' Brief at 12. In support of this argument, the City cites to an apparently repealed regulation concerning a "2.6 inch rule." City's Brief at 20. The City states that the Planning Commission

> had to interpret "impervious ground cover" in order to be able to apply the watershed ordinance. To do so, the Planning Commission adopted in 1976 a numerical standard: effectively, as long as a *surface* can absorb at least 2.6 inches of rain without runoff, it is not 'impervious.'

13

City's Brief at 20 (emphasis added).[10] Meanwhile, Owners contend that a Planning Commission representative clearly stated that "if a *project* manages 2.64 inches per hour, the [Planning Commission] will consider that *project* 'pervious' which is the determination made for the Hillcrest Development" and that this standard is based on consultation with the Water Department. Owners' Brief at 46-47 (citing Chiu's testimony at R.R. at 666a & 684a) (emphasis added); *see also* Owners' Brief at 12-13. While Owners and the City cite different sources, their argument is essentially the same, *i.e.*, they maintain that the Planning Commission has an infiltration requirement (which we will refer to as the 2.64 inch rule) and that the Planning Commission applies this to decide what is "impervious" under the WWOD Ordinance. They contend the ZBA erred in not giving deference to this interpretation of "impervious" and to the Planning Commission's determination that the plan did not introduce any new impervious ground cover.

At the first hearing, held February 5, 2014, the City presented the testimony of William Kramer, Director of the Planning Commission's Development Planning Division. F.F. No. 26. Kramer said the Commission approved the

---

[10] The City cites to both "Development Regulations ¶ I.B.5" as well as Planning Commission representative Sara Chiu's testimony. *See* City's Brief at 20. We note, however, that effective July 30, 2012, the Planning Commission adopted new regulations. Those regulations provide, "[a]ll regulations heretofore adopted by the City Planning Commission are hereby superseded." Phila., Pa., Planning Comm'n Regulation § 1.2 (2016); *see also* R.R. at 168a (containing memo from William Kramer, Director of the Planning Commission's Development Planning Division, to the Chief Deputy City Solicitor in which Kramer states: (i) that the Wissahickon Watershed regulations that were discussed at the hearing were approved by the Planning Commission on July 1, 1975, but that in 2012, the Planning Commission adopted new regulations which included appealing the prior regulations; and (ii) that he reviewed the entire document (regulations) and it contains no specific regulations with regard to the Wissahickon Watershed controls). Additionally, when Chiu was asked about the development regulations, she said that they were no longer used by the Planning Commission and that for the stormwater calculation part, the Planning Commission defers to the Water Department. R.R. at 674a.

14

development plan using a three-prong review: first, the Commission determined that a maximum of 27% impervious coverage was permitted on the entire site, which included 13.5% on one lot and 16.7% on the other lot;[11] second, the Commission reviewed the steep slopes;[12] and third, the Commission reviewed the plan for anything located within 200 feet of an open water body or 50 feet of a swale. F.F. No. 26; R.R. at 342a-43a. Kramer testified that the plans indicated that "these things" were within 200 feet of a swale and open body of water, but explained that "our interpretation on the particular section of the Code is because these were pervious coverage sidewalks, because these were green roofs on the buildings, themselves, we did not consider them to be impervious coverage, and therefore, we gave it a stamp of approval." R.R. at 343a-44a; *see* F.F. Nos. 26 & 31; R.R. at 346a-47a. When questioned about other sections of the WWOD Ordinance that permit impervious coverage, Kramer agreed that within the 200-foot setback area, no new impervious construction is allowed. R.R. at 346a. Kramer agreed that under the Zoning Code, including the 200-foot setback provision, the proposed construction was permissible because it resulted in no new impervious construction. F.F. No. 27, R.R. at 346a. He explained there was no new impervious ground cover within the 200-foot setback "because the buildings were being built with green roof and porous pavement for the driveway components of this plan." R.R. at 367a. Kramer explained that the determination was made by internal staff, not the Planning

___

[11] The WWOD allows for impervious coverage outside of the 200-foot setback but imposes coverage limitations. *See* Zoning Code § 14-510(6).

[12] This is not an issue before this Court.

Commission itself.[13] R.R. at 368a. Kramer did not testify about a 2.64 inch per hour rule. *See* R.R. at 341a-92a.

Kramer also testified that as part of the planning review process, the Planning Commission requires that "any development . . . have conceptual approval from the Water Department[,] [which] . . . is primarily concerned with stormwater management." R.R. at 348a. Kramer stated that the Water Department's conceptual approval was used by his office when it decided what "was permeable, and therefore was permissible within this distance of the open body of water." F.F. No. 28; R.R. at 348a.

On cross-examination, Kramer admitted that his staff "essentially" approved the plan without knowing the technical details of what the green elements are made of, stating "[w]e relied a lot on the handling of the storm water management review that the Water Department did to determine that it was porous and permeable, and that was the interpretation." R.R. at 377a. Kramer agreed that porous pavement is not the same as natural infiltration of water into the ground. R.R. at 376a. Kramer noted that the Water Department only completed a conceptual review and had not "moved to building permit components" and had not completed a full technical review of the stormwater management plan. R.R. at 387a-88a.

Kramer admitted that the Planning Commission has no written internal policies on how green elements, green roofs or retention basins are allowed in the 200-foot setback. R.R. at 373a. Additionally, when questioned as to whether there was impervious coverage, Kramer admitted that "[t]here may be a small amount with

---

[13] We note the Planning Commission's regulations authorize the Executive Director "to provide, on behalf of the [Planning] Commission, prerequisite approvals and recommendations on zoning permits and building permits in order to fulfill the Commission's duties pursuant to the Zoning Code." Planning Comm'n Regulation § 9.1.1. The Executive Director is defined as "[t]he Executive Director of the [Planning] Commission, or his or her staff designee." Planning Comm'n Regulation § 2.5.

16

retaining wall tops that I can't say definitively there isn't any, but it was minimal." R.R. at 373a-74a. He further agreed that the plan indicated that there are stone retaining walls within the "interior of the property, not just . . . along the exterior of the parcel[,]" as well as concrete steps. R.R. at 374a-75a. Kramer stated that he understands there is such a thing as porous concrete but agreed that it was not labeled as such on the plans. R.R. at 391a-92a.

At the February 5, 2014 hearing, Objector presented the expert testimony of land planner George Ritter, who stated that he "practiced in the field of land planning for more than 30 years . . . ." F.F. No. 18, R.R. at 294a. Ritter testified that he reviewed, among other things, the proposed plan. Ritter noted that the plan "proposed green infrastructure, a green roof[,] . . . permeable pavement . . . and two rain gardens." F.F. No. 23, R.R. at 316a. He disagreed with the Planning Commission's conclusion that those elements eliminated all impervious cover. F.F. No. 23, R.R. at 316a-17a. He stated that even if one accepts the argument on green infrastructure, new impervious ground cover still exists in the plans, because the stairs, sidewalks, retaining walls and curbs are not labelled on the plans as pervious. R.R. at 317a. Ritter also stated that his review of the plans showed there was impervious ground cover in violation of the 200-foot setback. F.F. No. 24, R.R. at 319a. Ritter acknowledged that green infrastructure can help with storm management, but stated storm management is a different issue. R.R. at 320a.

At a subsequent hearing held on April 29, 2015, the City also called Christine Majoram from the City's Water Department. F.F. No. 42. Majoram testified that the Water Department's goal is to approve a conceptual plan where stormwater management will be part of the property. F.F. No. 42. When asked to explain what conceptual approval meant, Majoram stated, "[i]t is a conceptual plan.

17

. . . It is showing the intent of how stormwater will be managed." R.R. at 537a. Majoram explained that the next step before issuing a building permit would be for the Water Department to issue a prerequisite approval and that one of those approvals is the stormwater management technical approval, "which is a much more in-depth technical analysis and calculations that get into the specific design of stormwater management systems . . . ." R.R. at 538a. Majoram explained that the Water Department has regulations that deal with stormwater management. R.R. at 539a-40a. She stated that the Wissahickon Watershed requirements are under the Planning Commission's purview and that the Water Department coordinates closely with the Planning Commission when a project is located within the watershed. *Id.*; *see* F.F. No. 42. Majoram stated that the Water Department regulations are more stringent than the Wissahickon Watershed requirements. R.R. at 553a; *see* F.F. No. 43; *see also* R.R. at 546a-47a. She agreed that the Water Department's review does not include review for compliance with zoning provisions and stated the review is for feasibility with meeting stormwater regulations. R.R. at 551a, 553a, 555a. She stated she had no knowledge of whether the plan included new impervious coverage. R.R. at 555a. Majoram explained that the green roof "allow[s] for the plant material and the media to allow for transportation, but it's not necessarily letting that water go into the ground." R.R. at 577a. Majoram did not discuss a 2.64 inch rule. *See generally* R.R. at 534a-85a.

Also at the April 29, 2015 hearing, Owners presented the testimony of Edmund Doubleday, a Leadership in Energy and Environmental Design (LEED) certified registered professional civil engineer. F.F. No. 49. He testified that the plan showed a green roof detail, driveways constructed of permeable paver material

18

and a higher retention basin that accounts for all the remainder of the runoff and that allows runoff to be infiltrated back into the sewer. F.F. No. 50.

At the April 29, 2015 hearing and later at a July 8, 2015 hearing, Owners also presented the expert testimony of Timothy Woodrow, a professional engineer. *See* F.F. No. 65, R.R. at 74a. Woodrow testified that it was reasonable to conclude that the proposed construction would not impede the natural infiltration of surface water into the soil. F.F. No. 66.

At the fourth and final hearing on July 8, 2015, the City, at the Board's request, presented the testimony of Sara Chiu, a City Planner for the Planning Commission, who stamped the plan for 114 Hillcrest Avenue as approved and explained the Commission's process in approving the plan. R.R. at 660a-61a; *see* F.F. Nos. 52-53. Chiu explained that when she receives a plan for a project within the WWOD, she reviews the plan for impervious coverage limitations, setback from a watercourse and steep slopes. R.R. at 670a, *see* R.R. at 660a-61a.

Chiu stated that when she reviewed the plan initially, she determined that the development was within the 200-foot setback, but that she approved the plan because she concluded there was no new impervious ground cover due to the use of green elements. F.F. Nos. 54-55; *see* R.R. at 664a, 669a. Chiu testified as to why she allowed construction within the 200-foot setback:

> So for the [Zoning] Code language there's no new impervious ground cover, we allowed [sic] to erect it within the 200 feet. With this proposal, they're proposing green roof. They're proposing pervious driveway. They're proposing using pervious concrete. So that has a plan attached – a stormwater plan was approved ahead of time when they come [sic] in. So all the stormwater runoff situation has been resolved.

R.R. at 664a.

When questioned as to what guidance she uses to determine whether there is any new impervious ground cover, Chiu stated that the infiltration requirement is not in the Zoning Code and "is in the older regulations that we have been using." R.R. at 666a. When questioned as to whether it was in a Planning Commission regulation, Chiu said, "I would say it's a policy because that infiltration requirement is an understanding between us and the Water Department." R.R. at 666a. Chiu also testified that the City Water Department has its stormwater regulations that are well accepted so the Planning Commission uses those as a supplement. R.R. at 673a. Chiu explained that the Water Department's stormwater regulations concerning the WWOD require the first 2.64 inches per hour of stormwater runoff to infiltrate. R.R. at 674a. Chiu was also asked about development regulations and whether they were still used by the Planning Commission. R.R. at 674a. Chiu replied, "No, actually not, because for the stormwater calculation part we defer to the Water Department for them [sic] to review." R.R. at 674a. Chiu explained that the stormwater regulations are a "more complete package." R.R at 674a. Chiu was asked later whether she was given any "guidance on what constitutes impervious when [she] determined that a green roof would be pervious coverage[.]" R.R. at 684a. Chiu replied, "[i]mpervious, if they can manage the 2.64 inch per hour run off rate, it's pretty good pervious material already, because you basically have the water draining down, not creating a runoff to the surrounding properties or to the city streets that is draining into the public sewer." R.R. at 684a.

The Zoning Code defines "impervious ground cover" as "[a]ny building, pavement, or other material that impedes the natural infiltration of surface water into the soil. Impervious ground cover includes, but is not limited to,

20

structures, swimming pools, paved and other non-permeable patios, walks, driveways, parking areas, streets, sidewalks, and any other non-permeable ground cover." Zoning Code § 14-203(154).[14] Terms such as "impede" and "non-permeable" are not defined in the Zoning Code. The ZBA noted that, according to its common usage, "impede" means "to interfere with or slow the progress of[.]" C.L. No. 20 (quoting Merriam-Webster Online Dictionary).[15] Therefore, something is impervious if it interferes with or slows the natural infiltration of surface water into the soil. Consequently, to know if a structure or material is impervious, one needs to know if that particular structure or material slows the natural infiltration of surface water into the soil.

Kramer admitted that porous pavement is not the same as the natural infiltration of water into the ground, but that the infiltration rate for the proposed material was never specifically calculated by the Water Department or the Planning Commission. Chiu's testimony indicates that, when determining the proposed

---

[14] This section of the Zoning Code was amended after the parties filed their appeal with this Court. *See* Phila., Pa., City Council Bill No. 180346-A § 14-203(154) (July 18, 2018). The Zoning Code now defines impervious ground cover as:

> [a]ny building, pavement, or other material that *substantially bars* the natural infiltration of surface water into the soil. *Manufactured materials demonstrated to be pervious shall not be considered impervious ground cover. The Commission may promulgate regulations regarding the types of cover that may be considered impervious, consistent with the intent of this definition.*

Zoning Code § 14-203(154) (amendments in italics). This amendment was not made retroactive. *See* City Council Bill No. 180346-A § 2 (stating "[t]his [o]rdinance shall take effect immediately"). Therefore, we must apply the definition in the Zoning Code as written at the time of Owners' permit application.

[15] Where terms are not defined in a statute, they should be "construed according to their common and approved usage." Section 1903 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1903. Courts generally use dictionaries as a source for determining the common and approved usage of a term. *Love v. City of Philadelphia*, 543 A.2d 531, 532 (Pa. 1988).

21

development was impervious, the Planning Commission applied an infiltration requirement that was in "older regulations" and was based on an understanding with the Water Department. We note that the older development regulations, requiring a *surface* to absorb at least 2.6 inches of rain without runoff to be deemed pervious, are not in effect,[16] although Chiu states that the "2.64 inch rule" continues as the policy of the Planning Commission because that "infiltration requirement is an understanding between [the Planning Commission] and the Water Department." R.R. at 666a; *see* R.R. at 674a. Additionally, Chiu explained that the Water Department's stormwater regulations concerning the WWOD Ordinance require the first 2.64 inches of stormwater runoff to infiltrate. R.R. at 674a. Chiu testified that if the *property* can manage the 2.64 inch per hour runoff rate, she would consider "it" pervious. R.R. at 684a.

Even accepting the infiltration rate requirement as the Planning Commission's policy, here, the policy utilized concerns a determination as to the stormwater runoff for the *entire property*. Such determination is irrelevant to whether there is impervious ground cover. The Zoning Code definition of impervious ground cover states that a "building, pavement, or other material" is impervious if it "impedes the natural infiltration of surface water into the soil." Zoning Code § 14-203(154). The City in its brief recognizes that "as long as *a surface* can absorb at least 2.6 inches of rain without runoff, it is not impervious." City's Brief at 20 (emphasis added). The record does not reflect any analysis of the surfaces within the 200-foot setback in this case.

It is apparent from the testimony that the 2.64 inch infiltration rate was applied to the *project*, not to the surface of any specific proposed material or

---

[16] *See supra* pp. 13-14 & note 10.

22

structure. Indeed, Kramer admitted that his staff "essentially" approved the plan without knowing the technical details of what the green elements are made of, stating that the Planning Commission "relied a lot" on the Water Department's conceptual approval of the stormwater management for the *property* to determine that the proposed elements of the construction were permeable. *See* F.F. No. 28; R.R. at 348a. Chiu testified similarly. *See* R.R. at 673a-74a, 684a.

The Planning Commission's review of the plan never included an analysis of whether the construction elements proposed within the 200-foot setback, "green" or otherwise, were individually impervious. Further, nothing in the record indicates that the Water Department made such a review. Indeed, Majoram, the Water Department representative, stated that the stormwater calculations are separate and different from the Zoning Code provisions regarding impervious coverage and that the Water Department's approval was only a conceptual approval of the plan. *See* R.R. at 537a-38a, 551a, 553a, 555a. Majoram also noted that she is unaware of whether the plan included new impervious coverage. R.R. at 555a.

The plain language of the WWOD Ordinance requires that there be *no* new impervious ground cover. Thus, we reject Owners' argument that if the *project* manages 2.64 inches per hour, the proposed impervious ground cover, *i.e.*, the materials and structures, within the 200-foot setback should be considered pervious. In sum, there is nothing to equate this infiltration rate requirement for the property and the management of stormwater for the project with the absence of impervious ground cover.

The Zoning Code, at the time of Owners' permit application, did not contain a definition of green roof, and the Planning Commission regulations do not

23

contain a definition of green roof; therefore, we must resort to its common usage.[17] A green roof is commonly defined as "[a] roof covered with vegetation, especially one intended to provide environmental benefits." "*green roof*," English: Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/us/green_roof (last visited Aug. 16, 2018). The traditional roof still exists, albeit covered with vegetation. *See supra* note 8. A green roof does not make the impervious elements of the underlying roof and building pervious. Majoram testified that the "water is falling into a stormwater management practice, so it's being managed to some degree in that green roof." R.R. at 581a. In other words, the green roof is a tool that simply manages the stormwater infiltration for that surface. Majoram explained that the green roof "allow[s] for the plant material and the media to allow for transportation, but it's not necessarily letting that water go into the ground." R.R. at 577a. In this case, the record is devoid of any analysis as to the particular effect that the proposed green roof has on the structure upon which it is situated or upon the natural infiltration of surface water into the soil. The only analysis conducted by the Water Department, and relied upon by the Planning Commission, was the stormwater calculation for the "project" as a whole.

To assume that a particular structure's or material's infiltration rate is at least 2.64 inches per hour, or to assume that a structure or material does not impede the natural flow of infiltration into the soil because the infiltration rate for the project is at least 2.64 inches per hour, is both arbitrary and inconsistent with the plain language of the ordinance requiring no new impervious ground cover. Therefore, the Planning Commission's interpretation was not entitled to deference. *See Lancaster Cty.*, 94 A.3d at 986 (stating an administrative agency's interpretation

_____

[17] *See* 1 Pa. C.S. § 1903; *Love*, 543 A.2d at 532.

24

carries little weight when it is inconsistent with the statute itself or when the statute is unambiguous); *cf. Turchi*, 20 A.3d at 594 (stating that an agency's interpretation of an ordinance is entitled to deference unless the interpretation is plainly erroneous or inconsistent with the ordinance).

Based on the evidence before it, the ZBA concluded that the 114 Permit allows for the erection of new impervious ground cover located within the 200-foot setback. C.L. No. 12. The Planning Commission's Executive Director, Kramer, testified that there were stone retaining walls, retaining wall tops and concrete steps within the interior of the property. R.R. at 373a-76a. Ritter, Objector's land planning expert, testified that there was impervious ground cover in the plans in violation of the 200-foot setback. F.F. No. 24. Ritter testified that "green elements" do not eliminate impervious ground cover. *See* F.F. No. 23, R.R. at 315a-20a. Further, Ritter stated that, at a minimum, there remained stairs, sidewalks, retaining walls, and curbs within the 200-foot buffer. *See* R.R. at 317a. Kramer's and Ritter's testimony is evidence which a reasonable mind might accept as adequate to support a conclusion that impervious ground cover exists within the 200-foot setback.

### b. 200-foot set back

Owners and the City, nevertheless, argue that the issuance of the permit can be sustained on the independent ground that the proposed development is not within 200 feet of the bank of a surface water body. We disagree.

The Zoning Code defines "bank of a surface water body" as "[t]he land that contains a surface water body at its highest flow." Zoning Code § 14-203(33). The Zoning Code does not contain a definition of "surface water body."

Chiu testified that although the prior version of the Zoning Code contained a definition of surface water body, the current Zoning Code does not. R.R.

25

at 661a. She stated that the Planning Commission's streams and swales map is traditionally used to determine setbacks from a watercourse. R.R. at 660a, 673a. Chiu explained that the streams and swales map is the official Wissahickon Watershed map and that it was produced in either 1973 or 1976. R.R. at 666a, 672a. She stated that the map identifies a surface water body in blue. R.R. at 665a. In referring to the map, she agreed that the map shows the creek going under Hillcrest Avenue and that where the map becomes blue again after being underground is the beginning of a surface water body. *Id.* She further agreed that she would draw a 200-foot arc around that to depict the setback. *Id.* She explained that when she reviews a plan, she compares the proposed plan with the streams and swales map. R.R. at 666a.

Chiu explained that there was a discrepancy on the plan submitted by Owners for the Planning Commission's review because that plan used the existing outfall from which to locate the 200-foot buffer. R.R. at 665a. Chiu stated that when the applicant and his engineer first came into her office to ask about the project, she showed them the streams and swales map and "it is right on the border line." R.R. at 665a. Chiu stated that when she reviewed the plan initially, she determined that the development was within the 200-foot setback, but that she approved the plan because she concluded there was no new impervious ground cover due to the use of green elements. F.F. Nos. 54-55; *see* R.R. at 669a.

On cross-examination, Owners presented Chiu with a new plan which was not previously submitted to the Planning Commission for review but was submitted for the first time as an exhibit at the July 8, 2015 hearing. *See* F.F. No. 58. The plan was prepared by Paul Lonie, a professional land surveyor who had also prepared the initial plan that was submitted to the Planning Commission showing

26

the 200-foot radius arc (the setback area). R.R. at 585a, 587a-88a. The new plan purported to show the 200-foot setback using the streams and swales map that Chiu previously explained she uses when she reviews plans. Chiu testified that the new plan "basically demonstrate[s] the building footprint is beyond the 200 feet." F.F. No. 58, R.R. at 682a. This was not the Planning Commission's decision when it approved the plan that was submitted for review. Indeed, in responding to why she approved the plan, Chiu testified, "we allowed [sic] to erect it within the 200 feet." R.R. at 664a.

Owners and the City argue that the critical question is what constitutes a "surface water body." They contend the Planning Commission uses the streams and swales map to designate what constitutes a surface water body. They argue that the Planning Commission's use of the map, rather than an ad hoc decision for each proposed development, which would require either a survey or physically visiting the property, is reasonable, and therefore, the ZBA should have accorded deference to the Planning Commission and its use of the streams and swales map to determine from what point to draw the 200-foot setback arc. They maintain that the ZBA improperly turned the issue into one of credibility, relying on other evidence offered at the hearing.

With respect to the other evidence, Owners presented, at two separate hearings, the expert testimony of Lonie. At the April 29, 2015 hearing, Lonie explained that he marked the setback area from an "outfall," which he explained was the location where the water, after being piped under Hillcrest Avenue, surfaces and reaches daylight. R.R. at 599a, 605a. When questioned as to why he marked the 200-foot radius from an outfall, Lonie stated that the Planning Commission asked him to do it. R.R. at 601a, *see* F.F. No. 47. Lonie stated that he did not make any

judgment as to whether this was a surface water body or swale, but he was just asked by the Planning Commission to show where the "closest watercourse" was and he physically located it and marked "[w]here the water was evident." R.R. at 609a-10a; *see* F.F. No. 48. Lonie agreed that the building envelopes were within the 200-foot setback. R.R. at 609a.

Owners later recalled Lonie at the July 8, 2015 hearing to testify about the new plan following Chiu's testimony. Lonie stated that after his earlier testimony, he learned that the Planning Commission uses its official maps to record open bodies of water and that he changed his plan to reflect that new information. R.R. at 686a. Lonie testified that his original map was prepared from a field survey. F.F. No. 64. He stated that he did not resurvey the property in preparing the new plan because he would not measure from the existing outflow; instead, he measured from the water body as depicted on the Planning Commission's streams and swales map. R.R. at 688a; *see* F.F. Nos. 61-62, 64.

The Planning Commission's determination is not entitled to deference here, as it was inconsistent and arbitrary. First, it must be noted that when Chiu reviewed the plan, she acknowledged that there was development proposed within the 200-foot setback. She approved the plan based on her decision that the development did not include impervious ground cover. Kramer testified similarly. R.R. at 343a-44a; *see* F.F. Nos. 26 & 31, R.R. at 346a-47a.

Notably, Kramer testified that the third prong of the Planning Commission's review process is to review for anything located within 200 feet of an open water body. R.R. at 343a. Chiu also testified that when she receives a plan for a project within the WWOD, her process is to review the plan for, among other things, setback from a watercourse, and that she traditionally uses the streams and

28

swales map for this purpose. R.R. at 670a; *see* 660a, 673a. Chiu testified that she compared the development plan with the streams and swales map. R.R. at 673a-74a. Chiu also testified that the initial plan shows the location of the outfall and the arc but that the outfall's location is not the same as the location of the end of the stream on the streams and swales map used by the Planning Commission. R.R. at 674a. Nevertheless, despite this apparent discrepancy, Chiu approved the plan. The Planning Commission accepted the original plan which was prepared based on a field survey. Only later did the Planning Commission say the plan should have been based on the streams and swales map. Accepting the original plan, which used the existing "outfall" contrary to the Planning Commission's claimed normal policy, then later claiming that the plan was not reviewed and interpreted properly under the streams and swales map pursuant to the Planning Commission policy is inconsistent and clearly arbitrary and, therefore, not entitled to deference. *Cf. Turchi*, 20 A.3d at 594 (stating that an agency's interpretation of an ordinance is entitled to deference unless the interpretation is plainly erroneous or inconsistent with the ordinance).

As the ZBA was not required to give deference to the Planning Commission here, the ZBA did not err in rendering its decision based on the evidence before it. In rendering its decision, the ZBA recognized conflicting testimony existed regarding the location of the 200-foot buffer in relation to the proposed construction. C.L. No. 12.

The ZBA found the testimony presented by Owners at the fourth hearing regarding the location of the 200-foot setback to be incredible.[18] C.L. No.

---

[18] Owners' counsel disputes Objector's statements that, at the first hearing, counsel "stipulated" that the development was within the 200-foot setback. This Court does not need to address whether counsel's statement constituted a stipulation, because, even without counsel's statement, there is substantial evidence to support the ZBA's finding that the proposed development fell within the 200-foot setback.

29

17. Instead, the ZBA credited the expert testimony of Ritter, who determined that the proposed development would fall within the 200-foot buffer. C.L. No. 15. Additionally, the ZBA noted that the Planning Commission determined the proposed development was within the 200-foot setback when the permit was issued. C.L. No. 16. Indeed, Chiu testified that when she approved the plan, she believed the development was located within the 200-foot setback. F.F. No. 56, R.R. at 669a. Kramer also confirmed that the plan was approved because what was being proposed within the 200-foot setback was not impervious. R.R. at 346a; *see* F.F. Nos. 30-31. It is well-settled that the ZBA is the arbiter of credibility. *Manayunk*, 815 A.2d at 658. This Court may not alter those findings.

The testimony of Chiu, Kramer and Ritter is such evidence that a reasonable mind might accept as adequate to support the ZBA's conclusion that the proposed development fell within the 200-foot setback and, consequently, constitutes substantial evidence to support the ZBA's decision on this issue.

We conclude that the trial court did not err in affirming the ZBA's determination that the proposed development introduced new impervious coverage within the 200-foot setback from a watercourse in violation of Zoning Code section 14-510(5), and, therefore, we affirm the trial court's order affirming the ZBA's decision to the extent it sustained the appeal of the 114 Permit.

Accordingly, for the foregoing reasons, we affirm the trial court's order affirming the ZBA.

_____
CHRISTINE FIZZANO CANNON, Judge

30

<u>IN THE COMMONWEALTH COURT OF PENNSYLVANIA</u>

In Re:  Appeal of Amit Azoulay,      :
Idit Azoulay and Assaf Lavon,        :
              Appellants    :
                              :
           v.            :
                              :
Philadelphia Zoning Board of         :
Adjustment and City of Philadelphia  :
and Hillcrest Preservation Alliance, :  No. 1085 C.D. 2017
LLC, and Friends of The Wissahickon  :
                              :

In Re:  Appeal of Amit Azoulay,      :
Idit Azoulay and Assaf Lavon         :
                              :
           v.            :
                              :
Zoning Board of Adjustment           :
                              :
In Re:  Appeal of Hillcrest          :
Preservation Alliance, LLC           :
                              :
           v.            :
                              :
Zoning Board of Adjustment           :
                              :
Appeal of:  Hillcrest Preservation   :  No. 1177 C.D. 2017
Alliance, LLC                        :

## O R D E R

AND NOW, this 7th day of September, 2018, the order of the Court of Common Pleas of Philadelphia County dated July 7, 2017 is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge