**RITTENHOUSE ROW**
and Don Davidow

v.

Dominic **ASPITE,** 1420–22 Chestnut Street Associates and the Zoning Board of Adjustment of the City of Philadelphia

**Appeal of: Dominic Aspite and 1420–22 Chestnut Street Associates.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 7, 2006.

Decided Dec. 19, 2006.

Joseph Beller and Christopher F. Stouffer, Philadelphia, for appellants.

Shawn D. Ward, Trevose, for appellee, Rittenhouse Row.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY President Judge COLINS.

Dominic Aspite and 1420 Chestnut Street Associates (collectively, Aspite) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court), which reversed a decision of the Philadelphia Zoning Board of Adjustment (ZBA) granting his application for a use variance. Aspite questions whether the trial court erred in concluding that he failed to establish a hardship. Discerning no error, we affirm the trial court's order reversing the ZBA.

At issue is the permitted use of the first floor of a multi-story structure located at 1420–22 Chestnut Street (property). The property is located within a C–4 commercial use area in the City of Philadelphia and falls under the protective umbrella of the Center City Overlay.[1] The Overlay is a creature of an Ordinance that when first enacted in 2000 pertained exclusively to the Rittenhouse Row area, and through

1. Philadelphia Zoning Code § 14–1607.1.

subsequent amendment has been widened to include Chestnut Street between Broad and Twentieth Streets. Philadelphia City Council enacted the Overlay to maintain the existing character of a designated area, to attract and promote certain specialty retailers, and to encourage the retailers to locate within a designated area. Philadelphia Zoning Code § 14–1607.1(1)(a). The Overlay regulates the use of a building.

Section 14–1601.1 of the Philadelphia Zoning Code [Rittenhouse Overlay] provides in pertinent part:

> (2) Uses Prohibited on the Ground Floor
>
> . . . .
>
> (c) Manicure/nail salon;
>
> (d) Retail sales of drugs;
>
> (e) Retail sales of general merchandise;
>
> (f) Retail sales of groceries;
>
> . . . .
>
> (j) Retail sales of variety store merchandise.

Section 14–1607 of the Philadelphia Zoning Code [Center City Overlay] states in pertinent part:

> (3) Prohibited Uses. In any building or upon any land abutting Chestnut Street or Walnut Street between Front Street and the Schuylkill River and Broad Street between South Penn Square and Washington Avenue and Market Street between Front Street and Fifth Street, the following uses shall be prohibited:
>
> (a) Amusement arcades;
>
> (b) Any use regulated by Section 14–1605, Regulated Uses;
>
> (c) Car wash;
>
> (d) Hand laundry;
>
> (e) Non-accessory or outdoor advertising signs;
>
> (f) Open air parking lots;
>
> (g) Outdoor sales or storage including outdoor use of coin operated machines which dispense food or drink, but not including open air cafes within the property line and not including any open air cafes on Broad Street between South Penn Square and Washington Avenue;
>
> (h) Parking as the sole use of a property;
>
> (i) Repair of motor vehicles;
>
> (j) Restaurants, cafes, coffee shops and other similar establishments for the sale and consumption of food and/or beverages, with drive-in or take-out service (sale of food and/or beverages to be consumed outside the confines of the premises); provided that take-out restaurants with a minimum of 20 seats for indoor dining of patrons shall not be prohibited along Market Street between Front Street and Fifth Street. . . .

In early 2004 Aspite applied to Philadelphia's Department of Licenses and Inspections (L & I) for a use variance seeking to lease the first floor of the property to 7–Eleven. L & I denied the request based on its determination that 7–Eleven was a convenience store and was not a permitted use within the Overlay district. Aspite appealed that decision to the ZBA contending that the application of the above two sections to the 1420–22 Chestnut Street property (property) precluded the opening of a convenience store such as 7–Eleven within the Overlay. That preclusion, argued Aspite, was so restrictive that when applied, it rendered the first floor of the property unmarketable and caused Aspite to suffer a hardship.

In support of that position, before the ZBA Aspite introduced evidence that prior to enactment of the Chestnut Street Over-

lay the property had been vacant for several years. Aspite explained that over the years,[2] the only businesses that had expressed an interest in leasing the space were businesses that under the current Code would be prohibited uses. Aspite testified that since the enactment of the Center City Overlay in 2004, 7–Eleven had expressed a desire to lease the space. Aspite submitted evidence that if 7–Eleven were permitted to operate, there would be no cooking on the premises, trash would be stored inside and taken out by 7–Eleven employees, and trash pick-up would occur at least three times a week between midnight and 6AM. There was also general testimonial evidence that 7–Eleven would be beneficial to the area. Finally, it was argued that applicable use prohibitions were a hardship and that the property was not otherwise marketable.

Objecting to Aspite's request for a use variance was Don Davidow, individually and on behalf of Rittenhouse Row Associates. In addition, area neighbors voiced their objections which echoed the sentiments of Davidow and Rittenhouse Row Associates that the proposed use would not compliment the neighborhood. The ZBA was not persuaded by the testimony of Objectors and granted the use variance. Rittenhouse Row Associates appealed to the trial court.

Before the trial court, Rittenhouse Row Associates argued that the ZBA's finding of hardship was not supported by substantial evidence. In response, Aspite argued that substantial evidence of record supported the ZBA's finding of hardship, and further, even if hardship had not been proven, the variance should be permitted as the Overlay is unconstitutional, in that it is exclusionary and violative of equal

protection, because it is not rationally related to a valid governmental purpose.

The trial court, without taking additional evidence, reversed the ZBA, concluding that Aspite had not established an unnecessary hardship. The trial court further concluded that there was no constitutional violation as the Overlay was not unreasonable and was neither arbitrary nor exclusionary. Aspite took an appeal of the trial court's decision to this Court.

■■■ Initially we note that because the trial court took no additional evidence, this Court's review is limited to a determination of whether the Board abused its discretion or committed an error of law. *Hitz v. Zoning Hearing Board of South Annville Township,* 734 A.2d 60, 65 n. 9 (Pa. Cmwlth.1999), *petition for allowance of appeal denied,* 562 Pa. 676, 753 A.2d 821 (2000). "The ZHB [Board] abuses its discretion if its findings are not supported by substantial evidence." *Id.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983).

■■■ First we address the constitutional claim. Aspite contends that the Overlay is unconstitutional in that it violates equal protection and due process of law. Aspite also contends that the Ordinance is not rationally related to a valid governmental purpose. As explained by our Supreme Court in *In Re Realen Valley Forge Greenes,* 576 Pa. 115, 838 A.2d 718, 728 (2003):

"[W]hen determining the validity of zoning ordinances, a zoning ordinance must be presumed constitutionally valid un-

---

2. It is undisputed that the property at issue had been vacant for several years prior to the enactment of the Overlay. Aspite explained

the vacancy as being the result of unsuitable tenants.

less a challenging party shows that it is unreasonable, arbitrary, or not substantially related to the police power interest that the ordinance purports to serve"

. . .

> Among other reasons, an ordinance will be found to be unreasonable and not substantially related to a police power purpose if it is shown to be unduly restrictive or exclusionary. Similarly, an ordinance will be deemed to be arbitrary where it is shown that it results in disparate treatment of similar landowners without a reasonable basis for such disparate treatment. Moreover, in reviewing an ordinance to determine its validity, courts must generally employ a "substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power."

Moreover,

> [t]he substantive due process inquiry, . . . must accord substantial deference to the preservation of rights of property owners, within constraints of the ancient maxim of our common law, *sic utere tuo ut alienum non laedas.* 9 Coke 59—So use your property as not to injure your neighbors.

(*quoting Hopewell Township Board of Supervisors v. Golla,* 499 Pa. 246, 452 A.2d 1337, 1341–42 (1982)); and, *C & M Developers, Inc. v. Bedminster Township Zoning Hearing Board,* 573 Pa. 2, 820 A.2d 143 (2002).

■ This Court agrees with the trial court's analysis that the prohibitions set forth in the Rittenhouse Overlay/Center City Overlay are for the purpose of preserving the historic and artistic value of the Center City Arts District. Additionally, the Overlay benefits the business owners, the visitors, and the citizens of Philadelphia. Contrary to Aspite's argument, the Overlay does not promote high-end stores to the exclusion of convenience stores. Rather, the Overlay attempts to control the overall commercial development of the Center City area, and that is a permissible government function. Likewise, the Overlay does not apply exclusively to Aspite's property. Instead, the Overlay is applicable to all properties within the designated area. We agree with the trial court that Aspite has not put forth evidence establishing that the Ordinance is unreasonable and not substantially related to a police power purpose because Aspite has not shown the Ordinance to be unduly restrictive or exclusionary. Furthermore, the Ordinance treats all landowners equally. Thus, there is no disparate treatment and the Ordinance cannot be found to be arbitrary. We therefore conclude that Aspite did not substantiate his challenge to the constitutionality of the Ordinance.

■ Aspite next contends that he met all criteria required for the granting of a variance. To establish entitlement to a variance, an applicant must prove, *inter alia,* the following: (1) the zoning Ordinance imposes unnecessary hardship resulting from the unique physical characteristics of the property, as distinguished from hardship arising from the impact of the zoning regulation on the entire district; (2) the alleged hardship is not self-inflicted; and (3) the required variance will not destroy the character of the neighborhood, nor be detrimental to the public welfare. Section 910.2 of the Pennsylvania Municipalities Planning Code;[3] *Valley View.* An

---

**3.** Act of July 31, 1968, P.L. 805, *as amended,* added by Section 89 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2.

applicant's burden is a heavy one, and a variance should be granted sparingly and only under exceptional circumstances. *Appeal of Lester M. Prange, Inc.*, 166 Pa.Cmwlth. 626, 647 A.2d 279 (1994).

■ To establish unnecessary hardship, the applicant must demonstrate that due to its physical characteristics, the property cannot be used for the permitted purpose or could only conform to such purpose at a prohibitive expense, or, that the property has either no value or only a distress value for any permitted purpose. *Isaacs v. Wilkes-Barre City Zoning Hearing Board,* 148 Pa.Cmwlth. 578, 612 A.2d 559 (1992).

■ In this matter, Aspite failed to present any evidence of unique physical conditions that prevented a reasonable use of the property. While Aspite may suffer a reduction of income upon denial of a variance, economic hardship is insufficient to establish unnecessary hardship justifying a grant of a variance. *Valley View.* Unnecessary hardship is shown only where the evidence establishes that compliance with the zoning ordinance could render the property practically useless. *Smith v. Zoning Hearing Board of Borough of Bellevue and Suburban General Hospital,* 152 Pa.Cmwlth. 427, 619 A.2d 399 (1992). Aspite failed to present such evidence.

However, *assuming arguendo,* Aspite had established a hardship, Aspite still had to establish that the proposed use was not contrary to the public interest. The preservation of the existing character of the designated area and the promotion of specialty retailers in the designated area is a stated goal of the Ordinance. The Overlay allows for the growth of businesses that support the historic and cultural character of the surrounding area. Code § 14–1670.1(1)(f). Herein, the evidence of record is testimonial evidence to the effect that Aspite, if granted a variance, would comply with all City ordinances and regulations. However, there is no evidence that the opening of a 7–Eleven compliments the public interest or supports the historic and cultural character of the designated area. Again, Aspite has failed to sustain his evidentiary burden.

Accordingly, the order of the trial court is AFFIRMED.

Judge SMITH–RIBNER dissents.

### ORDER

**AND NOW,** this 19th day of December 2006, the Order of the Court of Common Pleas of Philadelphia County entered in the above-captioned matter is **AFFIRMED.**

DISSENTING OPINION BY Judge McGINLEY.

I respectfully dissent to the majority's conclusion that "Aspite failed to present any evidence of unique physical conditions that prevented a reasonable use of the property ... [w]hile Aspite may suffer a reduction of income upon denial of a variance, economic hardship is insufficient to establish unnecessary hardship justifying a grant of a variance."

The Board made the following pertinent findings of fact and conclusions of law:

8. Mr. Beller further represented that the Applicant [Aspite] is committed to abiding by all seven (7) provisos contained in the Center City Residents' Association's (CCRA) March 29, 2004 letter, including trash pickup to occur a minimum of three times a week, between the hours of midnight and 6:00 A.M. (N.T. 6–8; CCRA letter dated March 29, 2004).

9. Mr. [Joseph] Beller represented that the subject premises have been vacant for three (3) years, and the only other uses that came to the owners of the building during that time were objectionable pursuant to the Rittenhouse Row overlay list and the owners did not deem those uses appropriate. Mr. Beller argued that the proposed 7–Eleven operations would be beneficial to the area. Further, there is hardship to the subject premises not to be able to use it for a commercial use in C–4. (N.T. 12–13).

10. The Zoning Board of Adjustment also heard and considered the testimony from Don Davidow, in charge of governmental affairs for Rittenhouse Row ... who noted that Rittenhouse Row strongly objects to the proposed use because it is contrary to the overlay which was passed by City Council, which states that no convenience stores shall be operated from 14th Street to 21st Street. The purpose of the overlay is to upgrade the area and bring customers from all over the City to shop on Chestnut Street. The proposed use is contrary to this purpose. (N.T. 15–16).

### CONCLUSIONS OF LAW

4. *The Applicant [Aspite] has met its burden to demonstrate that an unnecessary hardship will result if the use variance is not granted ....* (emphasis added).

5. *The Applicant [Aspite] has also met its burden of proof to demonstrate that the proposed use is not contrary to the public interest ....* (emphasis added).
6. The proposed use meets the applicable requirements for granting a variance.... [1]

The Decision of the Board, October 15, 2004, Findings of Fact (F.F.) Nos. 8–10 and Conclusions of Law (C.L.) Nos. 4–6 at 3–4 and 7–8; R.R. at 76a–77a and 80a–81a. On appeal the, the common pleas court heard legal argument from the parties and reversed.

In *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983), our Pennsylvania Supreme Court enunciated the criteria necessary to establish a variance:

The standards governing the grant of a variance are equally well settled. The reasons for granting a variance must be substantial, serious and compelling.... The party seeking the variance bears the burden of proving that *(1) unnecessary hardship will result if the variance is denied, and (2) the proposed use will not be contrary to the public interest* .... The hardship must be shown to be unique or peculiar to the property as distinguished from a hardship arising from the impact of zoning regulations on the entire district.... Moreover, mere evidence that the zoned use is less financially rewarding than the proposed use is insufficient to justify a variance.... In evaluating hardship the use of adjacent and surrounding land is unquestion-

---

1. The Board issued a use variance based upon hardship and never addressed the constitutionality of Section 14–606 of the Philadelphia Zoning Code ("the Center City Overlay") and Section 14–607.1 of the Philadelphia Zoning Code ("the Rittenhouse Overlay") raised by Aspite.

In *Zoning Board of Adjustment v. Willits Woods Associates,* 112 Pa.Cmwlth. 24, 534 A.2d 862, 863 (1987), the City of Philadelphia Zoning Board of Adjustment (ZBA) only addressed the non-constitutional issue that "mobile home parks were prohibited on the land parcel as zoned." With regard to the *"de jure* exclusionary zoning challenge, the ZBA stated that as an administrative agency established under the Philadelphia Home Rule Charter, it did not have the authority to determine the constitutional validity of the Zoning Code." *Id.* at 863.

ably relevant .... (citations omitted and emphasis added).

*Id.* at 555–57, 462 A.2d at 640–41. Finally, "[i]t is the function of the zoning board to determine whether the evidence satisfies the test and the courts will not disturb that determination unless it is not supported by substantial evidence, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 559, 462 A.2d at 642.

### A. Hardship

At the hearing, Joseph Beller (Beller), attorney for Aspite, represented to the Board:

> The store has been vacant for three years.... The only other uses that came to the owners of the building are all on the list in the Rittenhouse Row overlay, which, as this Board knows, only was for Walnut Street until last October when they switched it to Chestnut Street.[2]
>
> Whether it should or shouldn't be on Chestnut Street, I suggest to you kindly that it is not—doesn't have the same feeling that it would have had to have on Walnut Street.
>
> But in any rate, every one of those uses, which the management did not deem to be appropriate because the people either had no track record, no business plan,

and in some cases no credit, would have been a Dollar Store, a manicure store. And every one of those is listed.

> My suggestion is that this is the kind of use that will be beneficial to the area....
>
> To leave it remain vacant and to have one after another uses turned down because they're on this overlay ... *[w]e feel that there's a hardship to this building not to be able to use it for a commercial use in C–4*[3] ... I heard the Board say more than a hundred times, is not to leave a place open and vacant.
>
> (emphasis added).

N.T. at 12–14; R.R. at 21a–23a. *See* Board's F.F. No. 9 at 3; R.R. at 76a.

Although Rittenhouse Row asserts that any hardship suffered by Aspite was self-imposed because Aspite refused to rent the property to a dollar store and a manicure salon, the evidence established that these uses were also prohibited under the Rittenhouse Row Overlay.[4] In fact, if Aspite sought to lease the property presently to either the dollar store or the manicure store, he still had to apply for a use variance because the uses were nonconforming. *See* Section 14–1601.1(2)(c)(e) and (j) of the Philadelphia Zoning Code.[5]

Therefore, I would conclude that there was substantial evidence of record to es-

---

**2.** Jack Levin, of Philadelphia Management, verified that the property was vacant for three years and that he turned down two possible tenants, a dollar store and a manicure salon.

**3.** Levin's testimony corroborated Beller's statements to the Board. *See* N.T. at 23 and 36–38; R.R. at 32a and 45a–47a.

**4.** Section 14–1601.1 of the Philadelphia Zoning Code [Rittenhouse Overlay] provides:

(2) Uses Prohibited on the Ground Floor....

....

(c) *Manicure/nail salon;* (emphasis added)
(d) Retail sales of drugs;
(e) *Retail sales of general merchandise;* (emphasis added)

(f) Retail sales of groceries;

....

(j) *Retail sales of variety store merchandise* (emphasis added)....

**5.** Also, Section 14–1607 of the Philadelphia Zoning Code (Center City Overlay) provides:

(3) Prohibited Uses. In any building or upon any land abutting Chestnut Street or Walnut Street between Front Street and the Schuylkill River and Broad Street between South Penn Square and Washington Avenue and Market Street between Front Street and Fifth Street, the following uses shall be prohibited:

(a) Amusement arcades;

tablish that Aspite suffered an unnecessary hardship in his attempts to lease the property. As the Board correctly concluded from the evidence, the main opposition to Aspite's requested use variance was not directed at the proposed use, rather it was the desire to find a more upscale use for the commercial district. *See* Board's C.L. No. 5 at 8; R.R. at 81a. The Board's finding of hardship was supported by the evidence.

### B. The Public Interest

Section 14–1802 of the Philadelphia Zoning Code provides:

(1) The Zoning Board of Adjustment shall consider the following criteria in granting a variance under § 14–1801(1):

. . . .

(c) that the variance will not substantially or permanently injure the appropriate use of adjacent conforming property;

. . . .

(e) that the grant of the variance will not substantially increase congestion in the public streets;

(f) that the grant of the variance will not increase the danger of fire, or otherwise endanger the public safety;

(g) that the grant of the variance will not overcrowd the land or create an undue concentration of population;

(h) that the grant of the variance will not impair an adequate supply of light and air to adjacent property;

(i) that the grant of variance will not adversely affect transportation or unduly burden water, sewer, school, park or other public facilities;

(j) that the grant of variance will not adversely affect the public health, safety or general welfare;

(k) that the grant of variance will be in harmony with the spirit and purpose of this Title . . . .

Beller stated that "[t]he operation is . . . a normal operation . . . sales . . . a number of convenience things, cereals, milk, bread, eggs, juice, bakery items. The operation will have the trash completely stored inside and it will be taken out." N.T. at 4–5; R.R. at 13a–14a.

Janice Tancredi (Tancredi), market manager for Philadelphia 7–Eleven, testified the trash will "be in plastic trash cans that are wheeled out to the front of the store for disposal. So there will be no dumpster on the premises." N.T. at 34; R.R. at 43a. Tancredi stated that 7–Eleven has "a consolidated delivery . . . [that] we order in a computer and it's all delivered to a spot in New Jersey and then packed on one truck. But there are some thirty vendors that we order from that goes onto a truck. It's a small truck. It's not a large truck." N.T. at 41; R.R. at 50a. Tancredi concluded that fresh food items are delivered once a day, "the next delivery is the goods that the CVS gets as

(b) Any use regulated by Section 14–1605, Regulated Uses;
(c) Car wash;
(d) Hand laundry;
(e) Non-accessory or outdoor advertising signs;
(f) Open air parking lots;
(g) Outdoor sales or storage including outdoor use of coin operated machines which dispense food or drink, but not including open air cafes within the property line and not including any open air cafes on Broad Street between South Penn Square and Washington Avenue;

(h) Parking as the sole use of a property;
(i) Repair of motor vehicles;
(j) Restaurants, cafes, coffee shops and other similar establishments for the sale and consumption of food and/or beverages, with drive-in or take-out service (sale of food and/or beverages to be consumed outside the confines of the premises); provided that take-out restaurants with a minimum of 20 seats for indoor dining of patrons shall not be prohibited along Market Street between Front Street and Fifth Street. . . .

well ... [b]ut we do a twice-a-week delivery which would happen in the evening ... [and] [t]he other deliveries are Pepsi, Canada Dry and Coke." N.T. at 42; R.R. at 51a. Tancredi had not received any complaints concerning the operation and cleanliness of the other three 7–Eleven stores located in Center City. N.T. at 14; R.R. at 23a.

Finally, Beller also stated that Aspite agreed to follow the provisos outlined by the Center City Residents' Association:

1. All trash is to be internally stored and removed from this storage location by the trash hauler; trash is not to be placed on the street whether or not in a dumpster, cans, or bagged;

2. No sale or consumption of beer or alcoholic beverages on premises;

3. Trash is to be removed at a minimum of 3 times per week and shall be picked-up between the hours of 12 am (midnight) and 6 am;

4. Deliveries from their commissary shall be between the hours of 12 am (midnight) and 6 am;

5. No tables, chairs, benches, planters, bike racks, pay phones, signage or any other object placed on sidewalk;

6. No cooking on premises that requires mechanical ventilation;

7. Non opposition with provisos is contingent upon confirmation that proposed project will comply with any facade easement that may exist.

Letter from Center City Residents' Association, March 29, 2004, at 1; R.R. at 9a. *See also* N.T. at 6–8; R.R. at 15a–17a.

Again, I believe there is substantial evidence of record to support the Board's conclusion that the proposed use as a 7–Eleven convenience store was not contrary to the public interest.[6]

Accordingly, I would reverse the order of the common pleas court

Judge SMITH–RIBNER joins in this dissent.

Judge SIMPSON joins in this dissent.

---

**6.** Because I would determine that there was substantial evidence to support the Board's conclusion that there was unnecessary hardship and that the proposed use was not contrary to the public interest, I would not address Aspite's constitutional challenges to Section 14–1607.1 of the Philadelphia Zoning Code (the Rittenhouse Overlay).

In *C.B. Ex Rel. v. Pennsylvania Department of Public Welfare*, 567 Pa. 141, 786 A.2d 176 (2001), our Pennsylvania Supreme Court noted:

It is well-settled, of course, that, '[w]hen a case raises both a constitutional and a non-constitutional issue, a court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds.' *P.J.S. v. Pennsylvania State Ethics Commission*, 555 Pa. 149, 723 A.2d 174, 176 (1999). *See also Wertz v. Chapman Twshp.*, 559 Pa. 630, 741 A.2d 1272, 1274 (1999) ('It is axiomatic that if an issue can be resolved on a non-constitutional basis, that is the more jurisprudentially sound path to follow.').

*Id.* at 153, 741 A.2d 1272, 786 A.2d at 183.