# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Upper Roxborough Civic Association, :
                      Appellant    :
:
       v.                      : No. 372 C.D. 2019
                                : SUBMITTED: March 26, 2020
Zoning Board of Adjustment, City of :
Philadelphia, Joseph Delmonte, and :
David Branigan                :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ELLEN CEISLER, Judge (P)
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                             FILED: May 4, 2020

Appellant Upper Roxborough Civic Association (Association) appeals from the Court of Common Pleas of Philadelphia County's (Trial Court) March 8, 2019 order, through which the Trial Court affirmed a decision issued by the City of Philadelphia's (City) Zoning Board of Adjustment (Board) on December 20, 2017. In this decision, the Board granted variances sought by Appellee David Branigan (Branigan) in connection with Branigan's efforts to develop a property located at 7519 Ridge Avenue in Philadelphia (Property). After thorough review, we vacate the Trial Court's March 8, 2019 order and remand this matter to the Trial Court for proceedings consistent with this opinion.[1]

---

[1] On December 12, 2019, we precluded the Board, the City, and Joseph Delmonte from filing briefs or participating in oral argument, due to their respective failures to file briefs in this matter. Commonwealth Ct. Order, 12/12/19, at 1.

**Facts and Procedural History**

The Property, which abuts Ridge Avenue in Philadelphia's Roxborough section and is currently undeveloped, is roughly 100-feet-wide by 390-feet-deep and covers 36,261 square feet. Board's Findings of Fact (F.F.), ¶1. Its terrain contains steep slopes in some areas, which are a man-made feature predating Branigan's ownership. These slopes were created by the previous owner, who dumped an unspecified quantity of fill on the Property. *Id.*, ¶17.

In 2016, Branigan purchased the Property, which is zoned RSA-3 residential,[2] and subsequently filed a zoning/use application with the City's Department of Licenses and Inspections (L&I) in November 2016. *Id.*, ¶¶1-2, 4. Branigan's application called for a 5-story, mixed use building, with a grocery store on the ground floor, 22 interior parking spaces, and a total of 60 residential units situated on the floors above the store. *Id.*, ¶4. L&I denied this application on November 23, 2016, prompting Branigan to appeal to the Board on December 8, 2016. *Id.*, ¶¶5-6.

Prior to the Board taking action to address this appeal, Branigan submitted an amended application to L&I, in which he proposed to build 4 buildings on the Property, containing a total of 30 residential units, in the form of 15 duplexes, as well as 45 accessory parking spaces, 30 of which would be inside the buildings and 15 of which would be located outside. *Id.*, ¶7; Board Hr'g Tr., 8/9/17, at 44, 46; Reproduced Record (R.R.) at 345a. L&I denied the amended application on May 12, 2017. Board's F.F., ¶8.

The Board held a hearing regarding Branigan's appeal on August 9, 2017. Branigan testified that the Property had been vacant for as long as he could recall and that there had been a number of unsuccessful attempts to develop it over the

---

[2] "RSA" stands for "residential single-family attached." Phila. Zoning Code (Zoning Code) § 14-401(1)(a)(.1)-(.2).

years. Board Hr'g Tr., 8/9/17, at 7-9. According to Branigan, the Property could not be developed in an economically feasible way that would comply with its zoning restrictions. *Id.* at 9-10. As the Property is zoned RSA-3, it could be subdivided into a number of lots, upon which single-family homes or twin homes could be built by right. *Id.* at 10-13. Each home, however, would have a tremendously long backyard, due to the Property's dimensions. *Id.* Branigan also remarked that the market for single-family homes along that part of Ridge Avenue is "very tough." *Id.* at 12-13.

Branigan then pivoted to discussing his amended application, which contained a revised development proposal (Second Proposal) for the Property. This Second Proposal required three variances, in order to allow for multifamily residential units, multiple buildings on one lot, and construction on a steep slope area. *Id.* at 5. Branigan explained that he had presented several different revised proposals to the Association, which is the registered community organization for the part of Philadelphia in which the Property is situated, and that he had decided to go with the Second Proposal, which was the one "that was the most accepted of the three [by the Association's members]." *Id.* at 19. The cost of building in line with this Second Proposal was "substantial[ly]" greater than that forecast for the original, as the Second Proposal called for erecting structures deeper into the Property, necessitating increased expenditures to remediate steep slopes and to facilitate utility connections. *Id.* at 20-21. Accordingly, Branigan stated that it would be impossible for him to build this development in an economically viable manner with fewer than 30 residential units. *Id.* at 20-22, 30. Branigan admitted that he had been fully aware of the Property's zoning restrictions, including that it is in the Wissahickon Watershed Overlay District (Overlay District). The Overlay District covers a large area in the northwest part of Philadelphia. *See* Zoning Code § 14-510(4). Of relevance to this

3

matter, this overlay imposes limitations on the percentage of impervious ground cover a property in this area may have. *Id.*, § 14-510(5)-(6). Branigan also admitted that he had not purchased the Property with the expectation that he would receive relief from these restrictions in order to facilitate the Property's development. Board Hr'g Tr., 8/9/17, at 23-27.

Logan Dry (Dry) and Hyon Kang (Kang), architectural design professionals with KCA Design Associates, then testified regarding their involvement in creating the development proposals for the Property. Both explained that the initial, 60-unit mixed-use plan had been created after consultations with the City's Planning Commission, which had informed Dry and Kang that the Property was going to be rezoned CMX-2 commercial or RM-1 residential.[3] *Id.* at 32-33, 35-36. However, after additional meetings with both the Association and the Planning Commission, the current, 30-unit residential plan (*i.e.*, the Second Proposal) had been adopted by Branigan. *Id.* at 33-35. Kang echoed Branigan's claim that it was not feasible to do by right development of the Property, whether by building twin or single-family homes. *Id.* at 36-38.[4] The Property would have to be subdivided first before multiple homes could be built thereon, which would create oversized lots due to the Property's dimensions and the street frontage requirements imposed by RSA-3 zoning. *Id.* at 37-38. On cross-examination, Kang confirmed that the City's Planning Commission had certified that the Second Proposal complied with the Overlay District's impervious coverage limitations. *Id.* at 41. Per the Zoning Code, there are

---

[3] "CMX" stands for "neighborhood commercial mixed-use," while "RM" stands for "residential multi-family." Zoning Code §§ 14-401(1)(a)(.1), 14-402(1)(a)(.1).

[4] Kang expressly stated that he was unaware of the financial considerations underpinning Branigan's project and consequently could not speak to whether these considerations had affected the Second Proposal. Board Hr'g Tr., 8/9/17, at 44.

4

five categories of land areas within the Overlay District, each of which are subject to different limitations on the amount of impervious coverage permitted thereon. Zoning Code § 14-510(6)(a). Neither the Association nor Branigan dispute that the Property is in Category 4, which allows a maximum of 45% impervious coverage. *Id.*; *see* Association's Br. at 31-35; Branigan's Br. at 40-45. Additionally, Kang stated that, under the Second Proposal, the buildings would cover 33% of the Property, while paved areas would cover roughly another 20%. Board Hr'g Tr., 8/9/17, at 41-42.

George Ritter (Ritter), a land planner with Ruggiero Plante Land Design, then discussed the planning analysis that had been done in connection with the Second Proposal. Ritter testified that the City's Water Department had given preliminary approval to the stormwater management components of the Second Proposal. *Id.* at 57. He also expressed his opinion that the "mass and character" of the proposed duplexes were in keeping with the surrounding area and highlighted the Second Proposal's traffic plan, which enabled ingress and egress to and from Ridge Avenue using only a single driveway. *Id.* at 66-69, 77-78. When asked whether the Property could be developed in compliance with its RSA-3 zoning, Ritter replied that the only by right development that could be done without additional efforts would be to build one single-family home. *Id.* at 76. Though two sets of twin houses could theoretically be built, doing so would require the Property to be subdivided first and would potentially result in encroachment upon the steep slope areas of the Property, something which would necessitate variances. *Id.* at 75-76. In addition, Ritter stated the buildings would cover 33% of the Property, while 26% of the Property would remain as open space or be part of a rain garden. *Id.* at 69-72. Ritter subsequently expressed his belief that the Second Proposal was "suitable" and that the requested

variances were "reasonable." *Id.* at 78-79. On cross-examination, Ritter asserted that stormwater management would be drastically improved across the Property and specified that such management would be accomplished through a combination of "pervious" (*i.e.*, porous) paving surfaces and the aforementioned rain garden. *Id.* at 79-83. Ritter also admitted that those porous surfaces would alter the rate at which stormwater would enter the ground. *Id.* at 81.

Next, Branigan called realtor Jayme Feiertag (Feiertag),[5] as an expert witness regarding the housing market in the Roxborough area. Feiertag testified that the market's appetite for single-family homes fronting Ridge Avenue was extremely weak, something which Feiertag attributed in part to the danger posed to young children by the high volume of vehicular traffic on that road. *Id.* at 86-94. According to Feiertag, there was significantly greater demand for mixed use and multifamily developments along this portion of Ridge Avenue. *Id.* at 91.

Richard Giordano (Giordano), the Association's president, was then called to testify. Giordano articulated why his organization was opposed to Branigan's Second Proposal, voicing concerns over stormwater management on the Property, as well as the density of its proposed housing. *Id.* at 104-110. In response to questioning from Board Chairman Frank DiCicco, Giordano expressed his openness to additional negotiations with Branigan. *Id.* at 110-11, 116.

The Association's counsel then asked whether the City's Planning Commission had factored in the Second Proposal's use of porous pavement when it determined this proposal complied with the Overlay District's impervious ground cover limitations. *Id.* at 119. Paula Brumbelow, a senior planner with the Planning Commission, responded that the approval had been based upon the specifics of the

---

[5] Feiertag's name is misspelled in the Board's hearing transcripts as "Jamie Firetag."

Second Proposal, but that the Planning Commission did not consider porous pavement as being a type of impervious coverage; in other words, none of the Second Proposal's areas of porous pavement had been counted towards the requirement that no more than 45% of the Property be covered by impervious surfaces. *Id.*

The Board continued this matter, with the hope that the parties would come to an amicable agreement regarding the Property's development. *Id.* at 119-20.

On November 14, 2017, the Board held a second hearing regarding this proposed development. Branigan testified that he had met with the Association's members during the intervening time period, but said this effort to resolve the matter had not proved fruitful. Board Hr'g Tr., 11/14/17, at 6-7. Despite this, Branigan had reworked his development proposal again (Third Proposal), so that it covered the same footprint as before, but now had 18 residential units instead of 30. *Id.* at 7, 12-13.[6] Branigan explained that the 30 units from the Second Proposal had all been rental units, whereas the 18 units in the Third Proposal were all for resale; this shift from rentals to sales altered the financial calculus for developing the Property, "[b]arely" making 18 units economically feasible. *Id.* at 7-8. Discussing the Property's terrain, Branigan said that the steep slopes had been created by individuals who had dumped quantities of fill inside this vacant parcel. *Id.* at 8-10. Because of the placement of the steep slopes, Branigan could not build the Third Proposal in an economically feasible way if he was forced to avoid these slopes. *Id.* at 10-12. Branigan claimed this Third Proposal would cost "multiple hundreds of thousands of dollars more to develop" than his original, 60-unit mixed-use plan,

---

[6] Dry confirmed this by stating at this second Board hearing: "From the August hearing to here, the actual built footprint, height, building envelope, stayed exactly the same, parking, site layout. Literally, the only thing that changed in these is reconfiguring of the duplexes to single-family for the units in the back." Board Hr'g Tr., 11/14/17, at 20.

7

which called for a single building fronting Ridge Avenue, but said these revisions had been done in an attempt to be responsive to the Association's concerns. *Id.* at 14-17, 27-29.

Next, Giordano expressed the Association's opposition to Branigan's Third Proposal. Giordano said that the Association was still greatly concerned about the effect of building on the Property's steep slopes, as well as about stormwater management and compliance with the requirements of the Overlay District. *Id.* at 33-34, 36-40, 42-44, 49-50. These concerns, in the Association's view, remained completely unaddressed as a result of the development footprint remaining the same. *Id.* at 40, 51-52, 78-79. Giordano believed that the Third Proposal did not comply with the Overlay District's requirements, because the amount of porous pavement surfaces on the Property pushed this Third Proposal over the maximum allowed percentage of impervious coverage. *Id.* at 44-49.

Ritter, Branigan's land planner, then expanded upon the testimony he had offered at the August 2017 Board hearing. He reaffirmed that stormwater management would be greatly improved throughout the Property as a result of Branigan's development and stated that the Third Proposal improved upon the previous one, as it decreased the development's housing density and intensity of use. *Id.* at 57-65. In addition, Ritter admitted that the Third Proposal used porous paving elements, but asserted that it fully complied with the Overlay District's impervious coverage restrictions. *Id.*

Following Ritter, Joseph Delmonte (Delmonte), the Property's previous owner, offered some additional information about the Property's history. Delmonte told the Board that the Property had been in his family for more than 30 years and that he had been unable to successfully develop the Property during his 12 years of

8

ownership. *Id.* at 71-72. In addition, Delmonte stated that the Property had been plagued by individuals using it as a location for illegally dumping materials, so much so that Delmonte himself had dumped "a few loads of dirt" on the front of the Property, in an effort to impede unauthorized vehicular access to the Property's interior. *Id.* at 72.

Towards the end of the hearing, Branigan agreed to revise his development proposal yet another time (Fourth Proposal) and send it to both the Association and the Board for their consideration. *Id.* at 91-92, 95-99. The Association agreed to review this Fourth Proposal and expressly waived, through Giordano, both the requirement that Branigan post the Property with notice about the Fourth Proposal and its right to have another hearing before the Board. *Id.* at 98-99. In addition, it was agreed that L&I would simply update its denial to reflect the details of Branigan's Fourth Proposal, thereby enabling Branigan to keep the Fourth Proposal before the Board, rather than requiring him to start again from the beginning of the administrative review process. *Id.* at 96-98.

Branigan's counsel sent his Fourth Proposal, which now called for 16 residential units, to the Association's counsel on November 27, 2017. R.R. at 405a-408a. On December 6, 2017, Branigan's counsel transmitted this newest proposal to the Board, along with a letter in which he asked the Board to promptly grant the desired variance relief. *Id.* at 405a.

The Board did so, granting Branigan what the Board characterized as two use variances via a decision issued on December 20, 2017, one of which authorized him to construct multifamily residential units, while the other allowed him to build upon

the Property's steep slope areas. Board's Decision, 12/20/17, at 1; Board's Conclusions of Law (C.L.), ¶1.[7]

On January 19, 2018, the Association appealed the Board's Decision to the Trial Court. The Trial Court took no additional evidence and, on March 8, 2019, affirmed the Board in full. This appeal to our Court followed on March 21, 2019.

## Issues on Appeal

The Association raises a number of arguments for our consideration, pertaining to alleged errors made by the Trial Court in affirming the Board, which we have revised, reordered, and restated as follows. First, the Board erred by voting on Branigan's Fourth Proposal without first providing the legally required public notice and hearing. Association's Br. at 39-43. Second, the Board erred in granting Branigan's desired variances, as Kang, one of Branigan's own architectural design consultants, admitted that two sets of twin homes could be built on the Property by right, without the need for relief from the Zoning Code. *Id.* at 27-30. Third, the Board erred by determining that the Property's steep slopes are a physical characteristic of the land that creates an unnecessary hardship, as these steep slopes were man-made and resulted, at least in part, from the previous owner's failure to prevent illegal dumping. Association's Reply Br. at 3-6. Fourth, the Board erred by finding that the fact the Property is an "oversized lot" constituted an unnecessary hardship necessitating variance relief. Association's Br. at 30-31. Fifth, the Board erred in concluding that Branigan's pre-purchase knowledge of the Property's zoning limitations did not preclude Branigan from securing variance relief. *Id.* at 36-39.

---

[7] It is not clear what happened to the third variance that Branigan had sought, regarding erecting multiple buildings on one lot. However, the Association does not argue on appeal that the Board erred by implicitly determining that this third variance was not necessary. Hence, we need not address the substance of this issue.

10

Sixth, the Board erred by concluding that the granted variances are the minimum necessary to afford relief. *Id.* at 20-27. Finally, the Board erred by determining that Branigan's Fourth Proposal complied with the Overlay District's requirement that no more than 45% of the Property be covered by impervious surfaces. *Id.* at 31-35.

## Discussion

Preliminarily, we find the Association's argument that the Board failed to provide legally sufficient notice and to hold a hearing regarding Branigan's Fourth Proposal to be disingenuous. The Association specifically stated, on the record, that it did not require any additional pre-decision notice or a hearing from the Board regarding Branigan's Fourth Proposal, but now challenges the Board's Decision on those very bases by framing the argument in more general terms, as a defense of the public at-large's rights (*i.e.*, seeking the reversal of the Board due to the lack of notice and a hearing for the public at-large, rather than just the Association). Thus, we will not entertain this spurious argument.

Turning to the substance of this matter, it is well-settled that "variance[s] should be granted sparingly and only under exceptional circumstances." *Rittenhouse Row v. Aspite*, 917 A.2d 880, 884-85 (Pa. Cmwlth. 2006). Pursuant to the Zoning Code,

> [t]he . . . Board shall grant a variance only if it finds each of the following criteria are satisfied:
>
> > (.a) The denial of the variance would result in an unnecessary hardship. The applicant shall demonstrate that the unnecessary hardship was not created by the applicant and that the criteria set forth in [Zoning Code] § 14-303(8)(e)(.2) (Use Variances) below, in the case of use variances, or the criteria set forth in [Zoning Code] § 14-303(8)(e)(.3) (Dimensional Variances) below, in the case of dimensional variances, have been satisfied;

11

(.b) The variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation in issue;

(.c) The grant of the variance will be in harmony with the purpose and spirit of this Zoning Code;

(.d) The grant of the variance will not substantially increase congestion in the public streets, increase the danger of fire, or otherwise endanger the public health, safety, or general welfare;

(.e) The variance will not substantially or permanently injure the appropriate use of adjacent conforming property or impair an adequate supply of light and air to adjacent conforming property;

(.f) The grant of the variance will not adversely affect transportation or unduly burden water, sewer, school, park, or other public facilities;

(.g) The grant of the variance will not adversely and substantially affect the implementation of any adopted plan for the area where the property is located; and

(.h) The grant of the variance will not create any significant environmental damage, pollution, erosion, or siltation, and will not significantly increase the danger of flooding either during or after construction, and the applicant will take measures to minimize environmental damage during any construction.

Zoning Code § 14-303(8)(e)(.1). With regard to use variances in particular,

[t]o find an unnecessary hardship . . . the . . . Board must make all of the following findings:

(.a) That there are unique physical circumstances or conditions (such as irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions) peculiar to the property, and that the unnecessary hardship is due to such conditions and not to circumstances or conditions generally created by the provisions of

12

this Zoning Code in the area or zoning district where the property is located;

(.b) That because of those physical circumstances or conditions, there is no possibility that the property can be used in strict conformity with the provisions of this Zoning Code and that the authorization of a variance is therefore necessary to enable the viable economic use of the property;

(.c) That the use variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

(.d) That the hardship cannot be cured by the grant of a dimensional variance.

*Id.*, § 14-303(8)(e)(.2). As for dimensional variances, "[t]o find an unnecessary hardship . . . the . . . Board may consider the economic detriment to the applicant if the variance is denied, the financial burden created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood." *Id.*, § 14-303(8)(e)(.3).

Since the Trial Court took no additional evidence, our standard of review is restricted to determining whether the Board committed an abuse of discretion or an error of law. *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 639-40 (Pa. 1983). "We may conclude that the Board abused its discretion only if its findings are not supported by substantial evidence. . . . By 'substantial evidence' we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 640 (citations omitted).

In light of this limited standard of review, we must avoid the inclination to measure and assess the multitude of factors and considerations that support a zoning ruling, and "must exercise self-restraint as to substituting our opinions far removed

13

from the particular zoning hearing for the well-considered decision of [the Board]." *Cohen v. Zoning Bd. of Adjustment of City of Phila.*, 276 A.2d 352, 355 (Pa. Cmwlth. 1971). "It is, after all, the sole function of the Board, in the performance of its role as fact finder, to evaluate witness credibility and assign evidentiary weight." *Lower Allen Citizens Action Grp., Inc. v. Lower Allen Twp. Zoning Hearing Bd.*, 500 A.2d 1253, 1258 (Pa. Cmwlth. 1985) (punctuation omitted). Indeed, the "Board as fact finder is the ultimate judge of credibility and resolves all conflicts in the evidence," *Eichlin v. Zoning Hearing Bd. of New Hope Borough*, 671 A.2d 1173, 1175 (Pa. Cmwlth. 1996), and has "the power to reject even un-contradicted testimony if it finds it lacking in credibility." *Lower Allen*, 500 A.2d at 1258.

First, the Association correctly asserts that Kang, one of Branigan's architectural design consultants, essentially confirmed that two sets of twin homes could theoretically be built on the Property without the sought-after variance relief. The Association, however, ignores the well-settled proposition that, "in establishing [unnecessary] hardship, an applicant for a variance is not required to show that the property at issue is valueless without the variance or that the property cannot be used for any permitted purpose." *Marshall v. City of Philadelphia*, 97 A.3d 323, 330 (Pa. 2014). Indeed, Branigan himself never claimed that it was physically impossible to develop the Property in conformance with the Zoning Code; rather, he stated that it was "[e]conomically not feasible" to do so. Board Hr'g Tr., 8/9/17, at 10. Branigan's contention was supported by Feiertag, Branigan's expert witness on the real estate market in Roxborough, who testified as to how difficult it is to sell single-family homes on Ridge Avenue in the vicinity of the Property. While it is true that "mere economic hardship will not [in and] of itself justify a grant of a variance . . . [it

14

remains that] economic factors are relevant, albeit not determinative, in a variance assessment." *Marshall*, 97 A.3d at 330-31; *see also Allegheny W. Civic Council, Inc. v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 689 A.2d 225, 227 (Pa. 1997) ("Unnecessary hardship [can be] established by evidence that . . . the property can be conformed for a permitted use only at a prohibitive expense."). Kang's admission, therefore, does not in itself vitiate the Board's choice to grant the desired variances.

Next, the Association's arguments regarding the Property's man-made steep slopes and oversized dimensions, specifically that they do not constitute physical characteristics of the land that would justify variance relief, are respectively waived and without merit. The Association has waived its ability to raise the steep slope issue, because it did not do so first before either the Board or the Trial Court. *See Newtown Square E., L.P. v. Twp. of Newtown*, 38 A.3d 1008, 1017 (Pa. Cmwlth. 2011), *aff'd,* 101 A.3d 37 (Pa. 2014); *In re McGlynn*, 974 A.2d 525, 534 (Pa. Cmwlth. 2009); Pa. R.A.P. 302(a). As for the Property's dimensions, the Association mischaracterizes the Board's logic by stating that the Board "reason[ed] . . . variance[s] [were] warranted because the . . . Property is an 'oversized lot.'" Association's Br. at 30. In reality, the Board concluded that

> [t]he Property is an oversized, exceptionally deep, unevenly graded lot fronting on a highly trafficked [sic] street. It has been empty and undeveloped for decades and [Feiertag] testified to the difficulty of selling single[-]family homes located on Ridge Avenue. . . . [T]hese circumstances are sufficient to establish the hardship required for grant of a variance.

Board's C.L., ¶¶9-10. Thus, the Board made clear that the Property's size was but one of multiple reasons, each of which was backed by the evidentiary record, for why it determined an unnecessary hardship existed and that granting the variances was warranted.

15

Similarly, the Association's claim that Branigan's pre-purchase knowledge of the Property's zoning restrictions prevents him from obtaining variance relief is without merit. The Association argues that the Property's physical characteristics do not preclude Zoning Code-compliant development and the Board erred in concluding otherwise. Association's Br. at 36-39. In the Association's view, Branigan's request for variances was rooted in his desire to get the maximum financial return on his purchase of the Property, in spite of his full, pre-purchase awareness of the Zoning Code's regulations. *Id.* at 37-39. It is true that "pre-purchase knowledge of zoning restrictions limiting development, without more, does not create a hardship." *Wilson v. Plumstead Twp. Zoning Hearing Bd.,* 936 A.2d 1061, 1069 (Pa. 2007) (quoting *Manayunk Neighborhood Council v. Zoning Bd. of Adjustment of Phila.*, 815 A.2d 652, 657 (Pa. Cmwlth. 2002)). However, as we have already noted, the Board gave multiple, record evidence-supported reasons for why it determined that unnecessary hardship inhered to the Property and justified granting the variances sought by Branigan. Therefore, Branigan's pre-purchase knowledge of the Property's zoning restrictions does not render the Board's Decision erroneous or an abuse of discretion.

The Association correctly asserts that the minimization requirement of the Zoning Code's variance test[8] must be applied to requests for use variances. This is true, even though use variances' inherently qualitative nature (*i.e.*, pertaining to types of development, not characteristics like distance or size) makes it difficult to define what constitutes minimization in this context. *See In re Appeal of Redeemed Christian Church of God, Living Spring Miracle Ctr.* (Pa. Cmwlth., No. 930 C.D.

---

[8] *I.e.*, that a variance may only authorize the minimum deviation from the Zoning Code's strictures that is necessary to provide relief.

16

2015, filed December 28, 2016), slip op. at 18 n.7, 2016 WL 7449224, at *7 n.7;[9] *S. of S. St. Neighborhood Ass'n v. Phila. Zoning Bd. of Adjustment*, 54 A.3d 115, 124 (Pa. Cmwlth. 2012). Nevertheless, we must recognize that the Zoning Code expressly prohibits the Board from granting a variance unless the Board determines that "[t]he variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation in issue[.]" Zoning Code § 14-303(8)(e)(.1)(.b). The Board followed this dictate and concluded that

> the variances requested [by Branigan] are the minimum necessary to afford relief. [Branigan] repeatedly revised the proposal and decreased its density in an effort to gain community support. The final version approved by the Board places 16 dwellings on a lot that is more than 36,000 square feet in size. The proposed development meets all applicable dimensional requirements, provides more than the required number of parking spaces, and is designed to mimic the single-family massing of nearby residential properties.

Board's C.L., ¶13. In light of the evidentiary support in the record for these assertions, as well as our limited standard of review and the challenge inherent to determining the minimum necessary *use* variance in a given situation, we hold that the Board did not err or abuse its discretion by determining that the sought-after variances[10] afforded the minimum relief required to enable the Property's development.

---

[9] *See* Commonwealth Court Internal Operating Procedure § 414(a), 210 Pa. Code § 69.414(a) (unreported Commonwealth Court opinions issued after January 15, 2008, may be cited for their persuasive value).

[10] The Board characterized both of the granted variances as use variances. Board's C.L., ¶1. However, this is not entirely correct, as a steep slope variance is essentially a "hybrid," being neither a dimensional variance nor a use variance. *Pohlig Builders, LLC v. Zoning Hearing Bd. of*

Finally,[11] we agree with the Association that the Board erroneously determined that Branigan's Fourth Proposal complied with the requirement that no more than 45% of the Property be covered by impervious surfaces. When Branigan submitted his initial zoning/use application to L&I, the Zoning Code defined "impervious coverage" as

> [a]ny building, pavement, or other material that impedes the natural infiltration of surface water into the soil. Impervious ground cover includes, but is not limited to, structures, swimming pools, paved and other non-permeable patios, walks, driveways, parking areas, streets, sidewalks, and any other non-permeable ground cover.

Zoning Code § 14-203(154). Given that Ritter, Branigan's land planner, admitted that the porous elements altered the rate at which stormwater would infiltrate the ground, Board Hr'g Tr., 8/9/17, at 81, there is no dispute that these surfaces

_____

*Schuylkill Twp.*, 25 A.3d 1260, 1267 (Pa. Cmwlth. 2011). Steep slope ordinances are designed to protect natural resources; requesting a variance therefrom thus "falls into a grey area[,]" as the protection of natural resources "is not like setbacks or other traditional [zoning restrictions for which] dimensional variances [are appropriate]" and does not directly implicate the legally authorized uses of a property. *Zappala Grp., Inc. v. Zoning Hearing Bd. of the Town of McCandless*, 810 A.2d 708, 711 (Pa. Cmwlth. 2002). Steep slope variances have "a less stringent hardship requirement" than use variances. *Pohlig*, 25 A.3d at 1267.

The Association did not challenge the Board's mischaracterization of the granted steep slope variance. However, even if it had, we would have held that the steep slope variance was not granted in error. This is because there is substantial evidence in the record, specifically Branigan's testimony regarding his repeated efforts to decrease the density and scale of his proposed project while retaining some degree of financial feasibility, supporting the Board's conclusion that the steep slope variance it gave to Branigan afforded the minimum relief necessary to enable the Property's development.

[11] The Association also asserts that the Trial Court erred by ruling that the Zoning Code's minimization requirement is not applicable to use variances. Association's Br. at 22-24. This error by the Trial Court is irrelevant at best and harmless at worst, given that our standard of review in this matter mandates that we review the Board's Decision for legal error and the Board, as already noted, properly applied this minimization requirement to Branigan's Fourth Proposal.

18

constitute "impervious coverage" under the then-applicable portions of the Zoning Code.[12] *Azoulay v. Phila. Zoning Bd. of Adjustment*, 194 A.3d 241, 254 (Pa. Cmwlth. 2018). There is thus a strong likelihood both that L&I should have denied Branigan's Fourth Proposal, for noncompliance with the Overlay District's impervious coverage limitations, and the Board erred by failing to correct L&I's mistake. *See* Board's C.L., ¶¶14-15. This is in no small part because, as already noted, Ritter himself testified that the Second and Third Proposals called for extensive usage of porous paving elements, while Paula Brumbelow stated that the Planning Commission had not considered porous pavement to count as impervious coverage in the Overlay District. *See* Board Hr'g Tr., 8/9/17, at 79-83, 119; Board Hr'g Tr., 11/14/17, at 57-65.

It is unclear, however, whether these porous elements tip the Fourth Proposal into noncompliance with the 45% impervious coverage limitation. The Board did not make a factual finding as to the precise amount, in percentage or square footage, of area covered by porous elements in the Fourth Proposal. Nor is the answer readily

---

[12] Section 14-203(154) of the Zoning Code was amended after the Association appealed to the Trial Court, but before the Association's subsequent appeal to our Court. *See* Phila., Pa., City Council Bill No. 180346-A § 14-203(154) (July 18, 2018). As a result, "impervious coverage" is now defined as "[a]ny building, pavement, or other material that *substantially* bars the natural infiltration of surface water into the soil. *Manufactured materials demonstrated to be pervious shall not be considered impervious ground cover. The Commission may promulgate regulations regarding the types of cover that may be considered impervious, consistent with the intent of this definition*." Zoning Code § 14-203(154) (language added by amendment italicized). Even so, this revised definition was not implemented retroactively. *See* City Council Bill No. 180346-A § 2 (stating "[t]his [o]rdinance shall take effect immediately"). Consequently, we must apply the older definition in this situation.

apparent on the face of the record. Therefore, a remand is necessary, so that the Board can resolve this issue.[13]

## Conclusion

Accordingly, we vacate the Trial Court's March 8, 2019 order and remand to the Trial Court, with instructions that it further remand this matter to the Board, with instructions that the Board appropriately address whether Branigan's Fourth

---

[13] Branigan argues that the Association waived this issue, because the Association did not appeal L&I's initial failure to deny Branigan's zoning/use application for noncompliance with the Overlay District's impervious coverage limitations, as well as because the Association presented no evidence establishing such noncompliance. Branigan's Br. at 40-41, 43-44. We disagree. Requiring the Association to both appeal L&I's denial of Branigan's zoning/use application, to which it was not a party, with which it was not served, and by which it was not aggrieved, and to limit the challenges it raised thereto to the four corners of the refusal, would raise serious due process concerns. *See Soc'y Hill Civic Ass'n v. Phila. Zoning Bd. of Adjustment*, 42 A.3d 1178, 1190-93 (Pa. Cmwlth. 2012). Furthermore, the Association repeatedly questioned before the Board whether Branigan's development proposals complied with the applicable impervious coverage limitations and it is highly likely, as shown by the currently constituted record, that the Board erroneously determined that Branigan's Fourth Proposal complied with these limitations.

Branigan also argues that *Azoulay*, which interpreted for the first time the Zoning Code's definition of "impervious coverage" as encompassing porous elements, should not be applied here because it was decided after the Board had made its Decision, and that he is "entitled to have the case law applied to [him] that was in place at the time the [Board's D]ecision was rendered, not subsequent case law that was not binding at the time." Branigan's Br. at 41. Branigan cites no law in support of this argument, nor does he identify what case law he wishes to have us follow instead of *Azoulay*. Simply put, we have applied here the relevant parts of the Zoning Code, as they were written at the time of Branigan's initial zoning/use application, as well as during his subsequent appeal to the Board. The result may be adverse to Branigan's interests, but that is a function of those Zoning Code provisions, not the case law springing forth from them. "Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. . . . Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit." *Adams Outdoor Advert., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006) (internal citations omitted).

Proposal complies with the Zoning Code's impervious coverage limitations for the Overlay District.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Upper Roxborough Civic Association, :
                Appellant      :
                                    :
       v.                   : No. 372 C.D. 2019
                                      :
Zoning Board of Adjustment, City of  :
Philadelphia, Joseph Delmonte, and  :
David Branigan                 :

# **O R D E R**

AND NOW, this 4th day of May, 2020, the Court of Common Pleas of Philadelphia County's (Trial Court) March 8, 2019 order is hereby VACATED. It is FURTHER ORDERED that this matter is REMANDED to the Trial Court for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

_____
ELLEN CEISLER, Judge